68 F.3d 1180
 95 Cal. Daily Op. Serv. 8179, 95 Daily Journal
D.A.R. 14,085
Elba FREEMAN, d/b/a The RED TURTLE, Plaintiff-Appellant,
v.
CITY OF SANTA ANA; Clyde I. Cronkhite; Paul Walters; Ken
Ice; William Scheer; Brad Messmer; Stephen
Gales; Ignacio Barranco, Defendants-Appellees.
 No. 93-56470.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 7, 1995.
Decided Oct. 19, 1995.
As Amended on Denial of Rehearing and Suggestion for
Rehearing En Banc Dec. 29, 1995.
 
 Meir Westreich, Glendale, California, for plaintiff-appellant.
 Roxane M. Stafford, Kinkle, Rodiger & Spriggs, Santa Ana, California, for defendants-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before: WALLACE, Chief Judge, HUG, and HAWKINS, Circuit Judges.
 MICHAEL DALY HAWKINS, Circuit Judge:
 
 
 1
 We consider here the claims of a business owner that her business was subjected to unfair and discriminatory enforcement efforts by local police officers. Elba Freeman ("Freeman") is the owner of a bar/restaurant called The Red Turtle who sued the City of Santa Ana, California, its police chief, and several police officers ("defendants"),[1] alleging violations of her rights under the First, Fourth, and Fourteenth Amendments. She sought injunctive relief and damages under 42 U.S.C. Secs. 1981, 1983, 1985 & 1986. On September 23, 1993, after 22 days of trial, the district court granted the defendants' motion for judgment as a matter of law, pursuant to Fed.R.Civ.P. 50. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. Sec. 1291. We affirm in part, reverse in part, and remand.
 
 FACTS
 Complaint Against Officer Lodge
 
 2
 From 1976 to 1985, Freeman operated The Red Turtle without receiving any citations from either the Santa Ana Police Department ("SAPD") or from the Alcoholic Beverages Commission ("ABC"). However, in 1985, Freeman filed a complaint against SAPD Officer Steven Lodge, alleging that Lodge was harassing Freeman and her employees and customers, subjecting them to verbal abuse and even physically assaulting them on occasion. After Freeman filed the complaint against Officer Lodge, police involvement with The Red Turtle increased significantly.
 
 Attempted Sales of The Red Turtle
 
 3
 In September 1985 and again in October 1986, Freeman attempted to sell the bar to two different buyers. The first transaction fell through, and the buyer forfeited his $20,000 earnest money deposit, after the police met with him to discuss their concerns about the sale. The second buyer canceled the sales contract after the SAPD objected to the transaction and requested the imposition of numerous conditions on the liquor license.
 
 ABC Accusations
 
 4
 In 1987 and 1988, the police twice attempted to have the ABC file a "disorderly house" accusation against Freeman's liquor license. However, the ABC refused to file the first accusation because there was insufficient evidence connecting The Red Turtle with criminal activity. The second accusation was filed, but was dismissed in 1991 after the hearing officer determined that Freeman had not knowingly permitted narcotics transactions and other crime on the premises.
 
 November 1987 Raid
 
 5
 Late in the evening of November 29, 1987, six police officers entered the bar with at least one shotgun drawn. The officer who led the operation testified that the police were responding to a call that there was a man with a gun in the bar. An employee of the bar testified that no call to the police was made, but that the officers showed a photograph of a man to some of the patrons and said that he was suspected of carrying a weapon. The police secured the bar, detaining everyone for about twenty minutes, and conducted pat-down searches of the patrons, but no weapons were found.
 
 June 1988 Raid
 
 6
 In May 1988, Freeman contacted the police seeking help on how to control criminal activities in her bar. She testified that the police suggested she pull her security guards for a few days and "let things go," and then turn over to police the tapes from her security cameras.
 
 
 7
 On June 2, 1988, shortly after Freeman complied and provided the police with two video tapes, police initiated an undercover drug operation at the bar. As part of the operation, five undercover officers entered the bar to make controlled narcotics buys. After the buys were made, twenty police officers rushed in, with guns drawn, shouting and pushing people up against the walls. The officers conducted warrant checks and searches of the 20-25 people inside, and approximately six people were arrested for involvement in the drug transactions. Witnesses testified that the police used abusive and profane language during the raid. In order to "secure" the bar, officers forced open the door to the office and kitchen area, which was padlocked from the outside. Two video tapes from the security camera were seized, but were lost or destroyed before they could be booked into evidence.
 
 
 8
 Freeman filed a complaint with the police department regarding the June 2, 1988 raid. After an internal affairs investigation, Freeman's complaint was rejected.
 
 Citations Issued Against Freeman
 
 9
 Shortly after Freeman filed her original complaint in this lawsuit, the police issued four citations against her for allowing dancing in The Red Turtle without a dance permit. The citations were subsequently dismissed when the City Attorney did not comply with a discovery order.
 
 
 10
 On February 27, 1990, just a month after the dance citations were dismissed, police officers seized an allegedly contaminated bottle of alcohol and again cited Freeman. However, the citation was dismissed after laboratory tests showed the bottle was not contaminated. Freeman's counsel requested that the police maintain the bottle in evidence until this lawsuit was concluded, but the bottle was destroyed pursuant to SAPD policy just before trial was scheduled to begin in this case.
 
 
 11
 Freeman received another citation, on October 5, 1990, for exceeding The Red Turtle's occupancy limits. Freeman was found not guilty, however, because the city had not set an occupancy limit for the bar until after the citation had been issued.
 
 Dance Permit Denial
 
 12
 Freeman applied for a dance permit in August 1989, but the SAPD denied her application. The bases for the denial were (1) violations of the dance ordinances, (2) high crime in the area, (3) crime within the bar, and (4) improper zoning. Freeman appealed the denial and, although the hearing officer recommended that the city council affirm the SAPD's decision, he noted Freeman's efforts to reduce crime and suggested that the chief of police reconsider the denial. At the city council's request, the police chief did reconsider, and again denied the dance permit--stating that the area's high crime rate alone provided sufficient grounds to support the denial.
 
 December 1990 Raid
 
 13
 On December 7, 1990, the SAPD again raided The Red Turtle. All of the male patrons were ordered out of the bar, but the police detained the women and arrested six of Freeman's female employees. Freeman testified that many of the women were threatened with deportation if they did not sign preprinted confessions. Some of the women signed the confession forms but were deported anyway. The SAPD cited Freeman for solicitation of drinks by an employee. As a result, the ABC filed another accusation against Freeman's liquor license, but it was dismissed when Freeman agreed to a thirty-day suspension of her license and to drop the ABC from the present lawsuit.
 
 STANDARD OF REVIEW
 
 14
 The district court's grant of a judgment as a matter of law is reviewed de novo. Zamalloa v. Hart, 31 F.3d 911, 913 (9th Cir.1994). We "must view the evidence in the light most favorable to [Freeman] and draw all possible inferences in [her] favor." Id.; see also Miller v. Fairchild Indus., Inc., 885 F.2d 498, 503 (9th Cir.1989), cert. denied, 494 U.S. 1056, 110 S.Ct. 1524, 108 L.Ed.2d 764 (1990). The decision to exclude evidence is reviewed for an abuse of discretion, and should not be reversed absent some prejudice. McGonigle v. Combs, 968 F.2d 810, 818 n. 6 (9th Cir.), cert. dismissed, --- U.S. ----, 113 S.Ct. 399, 121 L.Ed.2d 325 (1992).
 
 DISCUSSION
 I. Freeman's Fourth Amendment Claims
 
 15
 Finding that Freeman had failed to demonstrate that the defendants had conducted unreasonable searches and seizures of The Red Turtle and its patrons, the district court granted the defendants' motion for judgment as a matter of law on Freeman's Fourth Amendment claims. Emphasizing that the evidence must be weighed in her favor, Freeman argues that the police raids, and the mass searches and seizures that accompanied them, provided sufficient evidence for the issue to go to the jury. We agree.
 
 
 16
 Freeman correctly notes that the Fourth Amendment protects the owner of a bar from unreasonable searches and seizures of her establishment. See Soldal v. Cook County, 506 U.S. 56, ----, 113 S.Ct. 538, 544, 121 L.Ed.2d 450 (1992) (holding that the Fourth Amendment protects property); Benigni v. City of Hemet, 879 F.2d 473, 477 (9th Cir.1988) (as amended June 15, 1989) (upholding jury determination that frequent bar checks were unreasonable under the Fourth Amendment); Blackie's House of Beef, Inc. v. Castillo, 659 F.2d 1211, 1216 n. 5 (D.C.Cir.1981) (holding that restaurant owner had standing to challenge entry and search of its premises), cert. denied, 455 U.S. 940, 102 S.Ct. 1432, 71 L.Ed.2d 651 (1982). The issue, therefore, is whether the officers' conduct was " 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989); see also Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968) (holding that when analyzing the reasonableness of a search or seizure, "it is imperative that the facts be judged against an objective standard"). The district court concluded that the searches and seizures were objectively reasonable as a matter of law.
 
 
 17
 The district court's conclusion was error. Considered in Freeman's favor, the evidence is sufficient for the question to go to the jury. When SAPD officers raided The Red Turtle in November, 1987, they were acting on information that someone in the bar was armed. The defendants argue that their actions were reasonable because they were responding to an emergency call. However, Freeman presented evidence that no one called the police, and that the police had a photograph of a specific suspect. The jury was entitled to determine whether, in light of this evidence, the officers' actions were indeed based on an emergency call, and if there was no emergency, whether the warrantless raid was justified. See Marshall v. Barlow's Inc., 436 U.S. 307, 312-13, 98 S.Ct. 1816, 1820-21, 56 L.Ed.2d 305 (1978).
 
 
 18
 In the June 1988 raid, the initial seizure of the bar might be found reasonable because it was not feasible to immediately identify the individuals who were involved in the drug transactions. But certainly reasonableness of the subsequent two to three hour detention of everyone in the bar, the pat-down searches, warrant checks and kicking down the door to the office/kitchen area, was a jury question. See Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) ("The scope of the detention must be narrowly tailored to its underlying justification."); Reid v. Georgia, 448 U.S. 438, 440, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1980) ("[A]ny curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity."); Ybarra v. Illinois, 444 U.S. 85, 90-96, 100 S.Ct. 338, 341-45, 62 L.Ed.2d 238 (1979) ("The 'narrow scope' of the Terry exception does not permit a frisk for weapons on less than reasonable belief or suspicion ... even though [the person searched] happens to be on the premises where an authorized narcotics search is taking place."); Terry, 392 U.S. at 19, 88 S.Ct. at 1878 ("The scope of the search must be strictly tied to and justified by the circumstances which rendered its initiation permissible.") (internal quotations omitted).
 
 
 19
 Finally, Freeman presented evidence that during the December 1990 raid, some of the women signed preprinted confessions after the police threatened them with deportation. The jury should have been allowed to determine whether this conduct was objectively reasonable. Therefore, we reverse the district court's decision granting the defendants' motion for judgment as a matter of law on Freeman's Fourth Amendment claims, and remand the case for a new trial on those claims.
 
 II. Freeman's Equal Protection Claims
 
 20
 A. Definition of the Similarly Situated Class
 
 
 21
 "The first step in equal protection analysis is to identify the [defendants'] classification of groups." Country Classic Dairies, Inc. v. State of Montana, Dep't of Commerce Milk Control Bureau, 847 F.2d 593, 596 (9th Cir.1988). To accomplish this, a plaintiff can show that the law is applied in a discriminatory manner or imposes different burdens on different classes of people. Christy v. Hodel, 857 F.2d 1324, 1331 (9th Cir.1988), cert. denied, 490 U.S. 1114, 109 S.Ct. 3176, 104 L.Ed.2d 1038 (1989). "The next step ... [is] to determine the level of scrutiny." Country Classic Dairies, 847 F.2d at 596. Classifications based on race or national origin, such as those alleged here, are subject to strict scrutiny. Clark v. Jeter, 486 U.S. 456, 461, 108 S.Ct. 1910, 1914, 100 L.Ed.2d 465 (1988).
 
 
 22
 Once the plaintiff establishes governmental classification, it is necessary to identify a "similarly situated" class against which the plaintiff's class can be compared. Attorney General v. Irish People, Inc., 684 F.2d 928, 946 (D.C.Cir.1982) ("Discrimination cannot exist in a vacuum; it can be found only in the unequal treatment of people in similar circumstances."), cert. denied, 459 U.S. 1172, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983). "The goal of identifying a similarly situated class ... is to isolate the factor allegedly subject to impermissible discrimination. The similarly situated group is the control group." United States v. Aguilar, 883 F.2d 662, 706 (9th Cir.1989), cert. denied, 498 U.S. 1046, 111 S.Ct. 751, 112 L.Ed.2d 771 (1991).
 
 
 23
 Freeman's equal protection claims are based on theories of retaliation and selective prosecution due to the national origin of the bar's patrons. "To establish impermissible selective prosecution, [Freeman] must show that others similarly situated have not been prosecuted and that the prosecution is based on an impermissible motive." United States v. Lee, 786 F.2d 951, 957 (9th Cir.1986). See United States v. Bourgeois, 964 F.2d 935, 938 (9th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 290, 121 L.Ed.2d 215 (1992).
 
 
 24
 Freeman defined her class as "Mexican immigrant bars," regardless of license type, with crime problems. She attempted to define the similarly situated control group as "non-Mexican immigrant bars" with crime problems. The district court, however, determined that for purposes of defining the similarly situated class, Freeman could only introduce evidence of premises with the same license type as The Red Turtle.[2]
 
 
 25
 Freeman argues that using license type to define the similarly situated class essentially precluded her equal protection claims. She contends that because her claims were founded on her allegation that the defendants treated Mexican immigrant bars more harshly than other similarly situated bars, without regard to the bars' license types, restricting the evidence to type 47 bars prevented her from proving her case.[3] Furthermore, Freeman argues, the district court's classification focused on an irrelevant similarity between license types, while ignoring the relevant factor of the patrons' race or national origin.
 
 
 26
 The district court has broad discretion to exclude evidence, LuMetta v. United States Robotics, Inc., 824 F.2d 768, 770 (9th Cir.1987), and we cannot say that the court abused that discretion by limiting evidence to type 47 bars. Although the court's decision may have made Freeman's case more difficult, it did not make her case impossible to prove. She could have compared the treatment she received with the way all other type 47 bars were treated in order to show how her bar was more harshly dealt with. Freeman's method ultimately may have proved to be better than that chosen by the district court, but that is not the test. Our review is limited to a determination of whether the district court abused its discretion. McGonigle v. Combs, 968 F.2d 810, 818 n. 6 (9th Cir.), cert. dismissed, --- U.S. ----, 113 S.Ct. 399, 121 L.Ed.2d 325 (1992). All things considered, we hold that it did not.
 
 
 27
 B. Denial of Freeman's Dance Permit Application
 
 
 28
 Freeman also claims that the defendants' denial of her dance permit application was arbitrary and capricious, thus violating the Equal Protection Clause. The denial was "irrational," according to Freeman, because "[n]o bar applicant for a dance permit other than plaintiff was every [sic] finally denied at least a conditional permit."
 
 
 29
 The defendants argue that the evidence unmistakably showed that the dance permit was denied for a reason authorized by the city's ordinance--high crime in the neighborhood. See Santa Ana Mun.Code Sec. 11-6. Although Freeman contends that other bars in high crime areas obtained dance permits, the fact remains that the denial was proper under the ordinance. Selective enforcement of valid laws, without more, does not make the defendants' action irrational. See Bordenkircher v. Hayes, 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978); United States v. Kidder, 869 F.2d 1328, 1335 (9th Cir.1989). The district court properly ruled that the defendants did not exercise their regulatory authority arbitrarily and capriciously. Therefore, it was not error to direct a verdict on this aspect of Freeman's equal protection claims.
 
 III. Freeman's First Amendment Claims
 
 30
 On defendants' motion, the district court ruled that Freeman could not establish a violation of her First Amendment associational rights, and excluded expert testimony on the issue. Freeman contends that whether such rights exist is a question of fact, and that it was error to make this determination as a matter of law.
 
 
 31
 The First Amendment, while not expressly containing a "right of association," does protect "certain intimate human relationships," as well as the right to associate for the purpose of engaging in those expressive activities otherwise protected by the Constitution. Roberts v. United States Jaycees, 468 U.S. 609, 617-18, 104 S.Ct. 3244, 3249-50, 82 L.Ed.2d 462 (1984). Freeman does not allege that her association with her patrons and employees was an expressive activity, but she claims that she maintained the sort of "intimate human relationships" to which the First Amendment applies.
 
 
 32
 In City of Dallas v. Stanglin, 490 U.S. 19, 25, 109 S.Ct. 1591, 1595, 104 L.Ed.2d 18 (1989), the Supreme Court made it clear that the First Amendment does not create a "generalized right of 'social association' that includes chance encounters in dance halls." This Court, faced with facts similar to those in the instant case, stated in dictum that "[t]he Stanglin case places the validity of ... first amendment claims [arising from association in a bar] into serious doubt." Benigni, 879 F.2d at 477. We now take the reasoning in Benigni to its logical conclusion: Freeman's relationships with her patrons and employees are not the sort "that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.' " Board of Directors of Rotary Int'l v. Rotary Club, 481 U.S. 537, 545, 107 S.Ct. 1940, 1945, 95 L.Ed.2d 474 (1987) (quoting Roberts, 468 U.S. at 619-20, 104 S.Ct. at 3250-51). The Red Turtle is a bar, not a private club, and can be patronized by any member of the public. The First Amendment provides no more protection to social association in a bar than it does to dance halls or rotary clubs. The district court did not abuse its discretion by excluding evidence regarding Freeman's First Amendment claims.
 
 IV. Freeman's Substantive Due Process Claims
 A. Retaliation
 
 33
 Under the Due Process Clause, there is a liberty or property interest in pursuing the "common occupations or professions of life." Schware v. Board of Bar Examiners, 353 U.S. 232, 238-39, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957); Chalmers v. City of Los Angeles, 762 F.2d 753, 757 (9th Cir.1985). Freeman attempts to establish a substantive due process violation by alleging that the defendants intentionally sought to force her out of business by "excessive and unreasonable police conduct." Benigni, 879 F.2d at 478. She maintains that the defendants were retaliating against her for filing a complaint against Officer Lodge in 1985.
 
 
 34
 To support this claim, Freeman lists a series of events that occurred in the years after she filed the complaint. After setting forth this long list of the defendants' conduct, Freeman summarizes the effect of this evidence:
 
 
 35
 Thus, for a number of years before her complaints, SAPD and its Vice Unit were friendly and left her alone. Immediately thereafter, plaintiff was suddenly deemed a major crime problem and subjected to a continuous stream of prosecutions and enforcement actions. This at least infers [sic] the requisite motive of retaliation and intent to deprive plaintiff's property and liberty interests without Due Process of Law.
 
 
 36
 While this list of events is impressive in terms of the number of incidents involving The Red Turtle, Freeman failed to demonstrate how the events were connected to the defendants' alleged retaliatory motive. The SAPD officers who are defendants in this case testified that they were not aware of the complaint against Lodge when they participated in the conduct challenged by Freeman. The district court found Freeman's "candid" responses during examination showed that her claims of retaliation are supported only by "suspicion and intuition as opposed to some fact." Freeman offered no other evidence sufficient to permit a jury to find that the police conduct was intended to drive her out of business. Because Freeman was unable to show a causal connection between the defendants' alleged retaliatory motive and their conduct towards her, the district court properly directed a verdict on this issue.
 
 B. Malicious Prosecution
 
 37
 Freeman also argues that the defendants maliciously prosecuted her, thereby violating her due process rights. Malicious prosecution, by itself, does not constitute a due process violation; to prevail Freeman must show that the defendants prosecuted her with malice and without probable cause, and that they did so for the purpose of denying her equal protection or another specific constitutional right. Bretz v. Kelman, 773 F.2d 1026, 1031 (9th Cir.1985) (en banc); Cline v. Brusett, 661 F.2d 108, 112 (9th Cir.1981). Freeman has not carried her burden on this issue.
 
 
 38
 Although she alleges that the defendants acted with intent to deprive her of constitutional rights, Freeman is unable to show that she was prosecuted without probable cause. See Brown v. Selfridge, 224 U.S. 189, 192, 32 S.Ct. 444, 446, 56 L.Ed. 727 (1912) (holding that plaintiff bears the burden of proving malice and lack of probable cause); see also Crowley v. Katleman, 8 Cal.4th 666, 34 Cal.Rptr.2d 386, 390, 881 P.2d 1083, 1087 (1994); Sheldon Appel Co. v. Albert & Oliker, 47 Cal.3d 863, 254 Cal.Rptr. 336, 339, 765 P.2d 498, 501 (1989). Freeman merely lists the series of citations that were issued against her and notes that they were dismissed. However, the mere fact a prosecution was unsuccessful does not mean it was not supported by probable cause. She does not point to any evidence indicating that probable cause was lacking. Thus, even if the defendants acted with the purpose of denying Freeman's constitutional rights, the district court did not err by directing a verdict on Freeman's malicious prosecution claims.
 
 V. Freeman's Entity Liability Claims
 
 39
 Freeman argues that the district court improperly determined as a matter of law that the City was not liable for the SAPD's actions under an entity liability theory.[4] 4] Freeman is correct in her assertion that the City is vicariously liable for actions and policies made by the police chief, city council or lower law enforcement officials to whom policy-making authority is delegated. See City of St. Louis v. Praprotnik, 485 U.S. 112, 123-26, 108 S.Ct. 915, 924-26, 99 L.Ed.2d 107 (1988); Chew v. Gates, 27 F.3d 1432, 1445 (9th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1097, 130 L.Ed.2d 1065 (1995); Davis v. Mason County, 927 F.2d 1473, 1480-81 (9th Cir.), cert. denied, 502 U.S. 899, 112 S.Ct. 275, 116 L.Ed.2d 227 (1991). Therefore, to the extent that the police officers were acting under the direction of the police chief or some other policymaker, their actions are attributable to the City. This determination involves factual questions, so it must be resolved at trial on remand.
 
 
 40
 In a corollary to this argument, Freeman claims that the district court abused its discretion by excluding evidence of the city council's decision to indemnify the defendants against any punitive damages awards. According to Freeman, by voting to indemnify the defendants, the city council essentially ratified their illegal conduct, triggering municipal liability. Gillette v. Delmore, 979 F.2d 1342, 1347-48 (9th Cir.1992), cert. denied, --- U.S. ----, 114 S.Ct. 345, 126 L.Ed.2d 310 (1993); Bouman v. Block, 940 F.2d 1211, 1231 (9th Cir.), cert. denied, 502 U.S. 1005, 112 S.Ct. 640, 116 L.Ed.2d 658 (1991).[5] The district court excluded evidence of indemnification as more prejudicial than probative under Fed.R.Evid. 403.
 
 
 41
 The decision to exclude evidence under Rule 403 falls squarely within the parameters of the trial court's discretion United States v. Kessi, 868 F.2d 1097, 1107 (9th Cir.1989). Because there were other grounds, besides the ratification theory, upon which Freeman could base her entity liability argument, the probative value of the evidence did not outweigh its prejudicial effect. Thus, it was not an abuse of discretion to exclude evidence of the indemnification decision.
 
 VI. Damages
 
 42
 Because we conclude that the district court erred by directing a verdict on Freeman's Fourth Amendment claims, remand for a new trial on those claims and a determination of damages, if liability is found, is necessary.
 
 
 43
 VII. Effect of Findings Made in an Administrative Proceeding and Mootness
 
 
 44
 Freeman moved for partial summary judgment on the ground that the defendants were precluded from re-litigating issues that were addressed in administrative findings from her dance permit appeal. In his report and recommendation, the administrative hearing officer noted that "[s]everal grounds were given for denial in the action taken by the Chief of Police, but this recommendation rests primarily on the [high crime rate in the neighborhood]." The district court ruled that "there is no identity of issues between this action and the administrative adjudication," and denied Freeman's motion.
 
 
 45
 Because we have concluded that the district court did not err in refusing to send the "dance permit" issue to the jury, the issue of the proper weight to be accorded administrative findings on this point becomes moot.
 
 CONCLUSION
 
 46
 Because the district court granted the defendants' motion for judgment as a matter of law after twenty-two days of trial, an order remanding the case for a new trial on even a single set of claims would be unfortunate for the cause of judicial economy. However, given the errors we have identified, a new trial is necessary. Therefore, we affirm in part, reverse in part, and remand to the district court for proceedings not inconsistent with this opinion. Freeman's request for attorneys' fees on appeal is denied, each party to bear its own costs.
 
 
 
 [1]
 Freeman's complaint also named as defendants Officer Steven Lodge, the California Alcoholic Beverage Commission, and one of its officials. However, she did not appeal the district court's disposition of her claims against these defendants
 
 
 [2]
 There are six license types that authorize on-premises sale of alcohol: type 40 allows beer only; type 41 permits beer, wine and food; type 42 allows beer and wine only; type 47 permits liquor and food; type 48 permits liquor only; and type 61 authorizes beer sales in stores that exclude minors. The Red Turtle is licensed under type 47, which, like type 41 licenses, includes both bars that serve food and so-called "mom-and-pop" restaurants that serve alcohol
 
 
 [3]
 In her offer of proof, Freeman indicated that 17 of 18 bars targeted for closure by the SAPD were Mexican immigrant bars, only two of which held type 47 licenses. She bases her selective prosecution claim on the evidence that there were 8 to 12 non-Mexican immigrant bars, with similar crime problems, which the SAPD did not attempt to close
 
 
 [4]
 Freeman does not, however, cite to a point in the record where the court expressly made this determination. Rather, the court merely directed a verdict in favor of the City on all of Freeman's claims against it without ever making a finding with regard to entity liability. This fact may help explain why the defendants did not directly respond to this portion of Freeman's brief
 
 
 [5]
 The defendants apparently misconstrue Freeman's argument on this issue, as they focus on whether indemnification evidence should be allowed when considering an actual award of punitive damages. Freeman was not seeking to introduce the city council's action in connection with a punitive damage claim, but was attempting to show that the city ratified the police officers' actions