CALIFORNIA PARENTS FOR the EQUALIZATION OF EDUCATIONAL MATERIALS, Plaintiff,

v.

Kenneth NOONAN, et al., Defendants.

No. CIV. S–06–532 FCD KJM.

United States District Court, E.D. California.

Feb. 26, 2009.

challenges the sufficiency of the evidence. *See Jones v. Wood,* 114 F.3d at 1008.

Michael Arthur Newdow, Michael Newdow, Esq., Sacramento, CA, Venkat Balasubramani, Balasubramani Law, Seattle, WA, for Plaintiff.

Elizabeth Anne Linton, G. Mateo Munoz, Kara Kathleen Read-Spangler, Attorney General's Office for the State of California, Department of Justice, Susan Elizabeth Slager, Office of the Attorney General, Sacramento, CA, for Defendants.

FRANK C. DAMRELL, JR., District Judge.

This matter is before the court on (1) plaintiff California Parents for the Equalization of Educational Materials ("plaintiff" or "CAPEEM") motion for partial summary judgment as to its Establishment Clause claim and (2) defendants'[1] motion for summary judgment, or alternatively, partial summary judgment as to plaintiff's second amended complaint, alleging claims for violation of the Equal Protection, Establishment and Free Speech and Association Clauses.[2] Generally stated, in this action, plaintiff alleges the California State Board of Education ("SBE") discriminated against CAPEEM's members during the 2005–2006 history-social science textbook adoption process and that the adopted sixth-grade textbooks represent Hinduism in a discriminatory and denigrating manner. During the adoption process, the SBE held public meetings, considered public comment and consulted with scholars to determine the appropriate content of its curriculum, including the appropriate portrayal of Hinduism in the context of world history and ancient civilization. Plaintiff's critical objection is that the SBE did not adopt all of the textbook edits for which its members were advocating, and that ultimately, the adopted textbooks represent Hinduism in a discriminatory light.

By its motion, CAPEEM seeks partial summary judgment on its Establishment Clause claim, to the extent it is based on the subject textbooks' alleged indoctrination of students in their portrayals of Christianity and Judaism.[3] More specifically, CAPEEM requests partial summary judgment on it Establishment Clause claim based on (1) defendants' alleged expressed intent to model portions of the subject history textbooks after the New Testament; (2) the alleged improper influence of religious figures in approving the material addressing Christianity and religious considerations that went into evaluating the suggested edits of the textbooks; (3) the adoption of textbooks that allegedly treat biblical narratives as historical facts and biblical events, including miracles, as actual events; and (4) the adoption of teachers' materials which purportedly emphasize aspects of indoctrination.

Defendants oppose the motion, first on standing grounds, arguing CAPEEM lacks standing to bring an Establishment Clause claim based upon the alleged unlawful indoctrination of students into the Christian

1. "Defendants" refers collectively to Kenneth Noonan, Ruth Bloom, Alan Bersin, Yvonne Chan, Donald G. Fisher, Ruth E. Green, Joe Nunez, Johnathan Williams and David Lopez, in their official capacities as Members of the California State Board of Education, and Tom Adams, in his official capacity as Director of the Curriculum Frameworks and Instructional Resources Division and Executive Director of the Curriculum Commission.

2. Because oral argument will not be of material assistance, the court orders these matters submitted on the briefs. E.D. Cal. L.R. 78–230(h).

3. Plaintiff also brings its Establishment Clause claim on an alternative theory: CAPEEM alleges defendants violated the Establishment Clause when it adopted the instructional materials and final edits which are allegedly biased against Hinduism and treated other religions more favorably and accurately. As set forth below, defendants move for summary judgment on this theory. Plaintiff does not cross-move for summary judgment on this issue. Instead, plaintiff's affirmative motion for partial summary judgment is limited to the theory of the alleged, unlawful indoctrination of students into the Christian and Jewish religions.

or Jewish religions because such a claim is not germane to its organizational purpose, which is to promote an accurate portrayal of the Hindu religion in California public schools. Alternatively, defendants contend plaintiff's Establishment Clause claim based on this theory fails on the merits, as an objective observer would conclude that the textbooks at issue, when viewed in context, are teaching about religion, rather than endorsing any particular religion. Because this court agrees that CAPEEM lacks standing to bring its Establishment Clause claim based upon the alleged improper indoctrination of students into the Christian or Jewish religions, it does not reach the substantive merits of CAPEEM's motion.[4] CAPEEM's motion for partial summary judgment is DENIED for lack of standing to bring the subject claim.

By their motion, defendants seek judgment in their favor as to all of plaintiff's claims for relief. Similar to their opposition to plaintiff's motion, defendants argue, in the first instance, that CAPEEM lacks standing to press any of its claims to the extent they are based on alleged discrimination in the textbook adoption process, and to the extent plaintiffs' claims challenge the textbooks' contents, plaintiff only has standing to allege violations of law based on the alleged negative treatment of Hinduism. Alternatively, defendants argue each of plaintiff's claims fail on their merits as follows: (1) plaintiff's equal protection challenge to the textbooks' contents fails under controlling Ninth Circuit law,

and its equal protection challenge to the adoption process fails because plaintiff has no evidence to support a finding of discriminatory intent by defendants, CAPEEM cannot identify a similarly situated group and/or CAPEEM's members were treated the same as other similarly situated participants in the process; (2) plaintiff's Establishment Clause claim fails because defendants' actions did not promote other religions over Hinduism nor was the primary effect of defendants' actions hostility towards Hinduism; and (3) plaintiff's Free Speech and Association Clause claim fails because plaintiff cannot show how defendants' actions chilled CAPEEM members' free speech and association rights.

For the reasons set forth below, the court GRANTS defendants' motion as to plaintiff's Establishment and Free Speech and Association Clause claims. As to plaintiff's equal protection claim, the court GRANTS defendants' motion to the extent plaintiff's claim is directed at the textbooks' contents, as such a claim is not viable as a matter of law, but DENIES defendants' motion to the extent it is directed at plaintiff's process-related challenge. As to that issue, triable issues of fact exist as to whether CAPEEM's members were treated fairly in the adoption process.

## BACKGROUND [5]

During the sixth grade world history and ancient civilizations course, California

---

4. As such, with the exception of those facts pertaining to the standing inquiry, the court does not recount herein the facts which are only pertinent to CAPEEM's motion.

5. Unless otherwise noted, the facts set forth below are undisputed. Where a dispute of facts exists, the court recounts the facts in the light most favorable to plaintiff. Both parties filed various objections to each other's evidence. In large part, the court declines to

rule on said objections as it does not rely on the subject evidence in rendering its decision herein. However, to the extent it does rely on any objected-to evidence, the party's relevant objection is overruled. As to plaintiff's separately filed motion to strike defendants' expert Gonzalez–Reimann's expert report and rebuttal report (Docket # 189), the court DENIES the motion as moot. The court does not rely on said reports in rendering judgment in defendants' favor in the respects set forth below.

students study the history and impact of various religions, including Hinduism. (Defs.' Stmt. of Undisputed Facts in Supp. of MSJ, filed Dec. 30, 2008 [Docket # 158] [hereinafter, "DUF"], ¶ 2.) [6] The SBE adopts textbooks and must balance the goals of a fair and accurate description of history with sensitivity to different cultural, ethnic and religious groups. Cal. Const. Art. IX, § 7.5; Cal. Educ.Code §§ 60200–60206, 60040, 60044. The State's curriculum requirements for textbook publishers are set forth in the *Criteria for Evaluating Instructional Materials in History–Social Science, Kindergarten through Grade Eight; The History–Social Science Content Standards* ("Content Standards") and the *History–Social Science Framework for California Public Schools, Kindergarten Through Grade Twelve* ("Framework"). (Adams Decl., filed Dec. 30, 2008 [Docket # 160], at Ex. B.) The Content Standards describe what students should know and be able to do by the end of each grade level. (*Id.*) These criteria are used to determine whether instructional materials submitted to the SBE should be adopted. (*Id.*; Adams Decl., ¶ 6.)

As explained in the Framework, the kindergarten-grade 8 history-social science curriculum is designed with the idea that knowledge of history-social science disciplines is essential in preparing students for responsible citizenship and in comprehending global interrelationships. (Defs.' Stmt.

of Add'l Disputed Facts in Opp'n to Pl.'s MSJ, filed Jan. 13, 2009 [Docket # 173] [hereinafter, "DDF"], ¶ 156.) Studying major religious and philosophical traditions helps students to understand people's historical struggles with ethical issues and the current consequences, wars and political arrangements, like separation of church and state. (DDF ¶ s 157, 158.) Students learn about religious beliefs and texts in order to better understand cultural continuity and conflict. (DDF ¶ 159.) The Framework includes guidelines for teaching about religion. (DDF ¶ 160.)

The study of religion is done within the larger context of human history. (DDF ¶ s 156–168.) In grade six, students study the world history and geography of ancient civilizations, including the early societies of the near East and Africa, the ancient Hebrew civilization, Greece, Rome and the classical civilizations of India and China. (DDF ¶ 161.) Students receive an overview of these societies, including the geography of the region; trade; art; social, economic and political structures; and the everyday lives of the people. (DDF ¶ 162.) In this context, students study about the religions and religious texts of the different ancient civilizations. (DDF ¶ s 163–168.) The Content Standards identify certain information which must be taught. (DDF ¶ 168.)

In January 2005, the SBE issued an invitation to publishers to submit instruc-

---

**6.** Plaintiff filed a response to defendants' statement of undisputed facts, setting forth only those facts to which it claimed were disputed. (CAPEEM's Stmt. of Disputed Facts re: Defs.' MSJ, filed Jan. 13, 2009 [Docket # 175] [hereinafter, "RDF"].) Thus, in all other respects, the court treats defendants' stated facts as undisputed. Where plaintiff has raised material, admissible evidence to dispute a particular fact, the court cites to either plaintiff's response to defendants' statement of undisputed facts (the aforementioned "RDF") or to plaintiff's separately filed statement of (purported) undisputed facts filed in opposition to defendants' motion (Defs.' Resp. to Pl.'s Stmt. of Undisp. Facts, filed Jan. 23, 2009 [Docket # 201] [hereinafter, "PDF"].) While plaintiff proffers these facts as *un* disputed, in most material respects the facts are disputed by defendants. (*Id.*) Ultimately, the court cites to either the "RDF" or "PDF" when denoting facts raised by plaintiff which create a triable issue of fact and thus provide a basis for the denial of defendants' motion in the respects set forth below.

tional materials for new sixth grade history-social science textbooks. (DUF ¶ 1.) Eleven publishers submitted instructional materials for consideration. (*Id.*) Nearly a year earlier, beginning in February 2004, the SBE had solicited and selected 12 Content Review Panel ("CRP") and 62 Instructional Materials Advisory Panel ("IMAP") members to review the publishers' submissions. (DUF ¶s 3–4.) The CRP members are subject matter experts who review the submitted instructional materials for accuracy, scholarship and alignment with the State's curriculum requirements (i.e., the Content Standards and Framework). (DUF ¶ 3.) The IMAP members are generally K–12 teachers. (*Id.*)

The CRP and IMAP received training in April 2005 and convened for deliberations on July 11–14, 2005. (DUF ¶ 5.) They then prepared a joint advisory report, which was mailed to the Curriculum Commission (the "Commission") on September 14, 2005. The report was made available to the public. (*Id.*) The Commission is an advisory body that advises the SBE on the adoption of curriculum frameworks and instructional materials. The SBE considers the Commission's recommendations but is not obligated to follow them. (DUF ¶ 6.)

The Commission held public hearings on September 29–30, 2005, at which parties could submit comments orally or in writing. (DUF ¶ 8.) The Commission received extensive public comments that could not be addressed at the meeting and could not be evaluated for accuracy at that time. (*Id.*) In particular, the Commission received lengthy submissions from the Institute of Curriculum Services ("ICS"), regarding the portrayal of Judaism in the textbooks, the Council on Islamic Education ("CIE"), regarding the portrayal of Islam in the textbooks, and the Hindu Education Foundation ("HEF") and the Vedic Foundation ("VF"), regarding the

portrayal of Hinduism in the textbooks. (DUF ¶ 10.) CAPEEM member, Karthik Venkataramani, combined certain CAPEEM members' proposed textbook edits with HEF's and worked with HEF throughout the process (these edits are referred to herein as the "HEF/VF edits"). (DUF ¶ 11.)

In order to give full consideration to the public comments, the Commission formed an Ad Hoc Committee to consider if the recently received public comments should be included in the Commission's final recommendation to the SBE. (DUF ¶ 9.) The Ad Hoc Committee held a publicly noticed meeting on October 31, 2005 and reviewed extensive written reports and comments from the public and the CRP. (DUF ¶ 12.) The California Department of Education ("CDE") contracted with three former CRP members: Dr. Williamson Evers, Dr. Naomi Janowitz and Dr. David Nystrom. Additionally, CDE hired Dr. Shiva Bajpai, who HEF had recommended, as a scholar to review the Hindu edits. (DUF ¶ 13; RDF ¶ 1.) Dr. Bajpai approved the edits proposed by HEF and VF almost in their entirety. (DUF ¶ 14.) At the October 31 meeting, Dr. Bajpai discussed the Aryan Invasion Theory ("AIT") and argued that scholarship no longer supported the hypothesis. (DUF ¶ 15.) The State's Content Standards required publishers to "discuss the significance of the Aryan invasion." (*Id.*)

Ultimately, the Ad Hoc Committee recommended edits to the SBE, including those that Dr. Bajpai had endorsed. (DUF ¶ 16.) All of the edits approved by the Commission and Ad Hoc Committee were submitted to the SBE, along with all public comments. (DUF *Id.*) Prior to the SBE's textbook adoption meeting on November 9, 2005, it received correspondence from scholars and individuals expressing concerns about the proposed edits offered

by HEF/VF that were recommended for adoption by the Ad Hoc Committee. (DUF ¶ 17.) These letters raised concerns about the accuracy of the Ad Hoc Committee's recommended edits and about the objectivity and scholarly accuracy of Dr. Bajpai's recommendations regarding the HEF/VF edits. (*Id.*; DUF ¶ 22.)

For example, Dr. Charles Munger, a member of the Commission, sent a letter to the SBE on November 3, 2005, noting that AIT is taught at college level courses at Stanford and the University of California. (*Id.*) On November 7, 2005, Dr. Michael Witzel, Professor of Sanskrit, Harvard University, sent a letter to the SBE expressing concern about the HEF/VF edits. (*Id.*) In his letter, Dr. Witzel expressed concern that the proposed changes to early Indian history were politically motivated. He attached one of his scholarly publications regarding the political revision of textbooks in India. (*Id.*)

The next day, November 8, 2005, the SBE received a second letter from Dr. Witzel signed by nearly 50 international scholars, urging the SBE to reject the edits proposed by "nationalist Hindu ('Hindutva') groups." [7] (DUF ¶ 18.)

> The agenda of the groups proposing these changes is familiar to all specialists in Indian history, who have recently won a long battle to prevent exactly these kind of changes from finding a permanent place in history textbooks in India. The proposed revisions are not of a scholarly but of a religious-political nature ... These opinions do not reflect the views of the majority of specialists on ancient Indian history nor of mainstream Hindus.... It would trigger an immediate international scandal if the California State Board of Education

were to unwittingly endorse religious-nationalistic views of Indian history from which India has only extricated itself in the last two years.

(DUF ¶s 18–19.) The letter also directed the SBE to two U.S. State Department reports that discussed textbook revisions in India when the government was controlled by the Bharatiya Janata Party, a Hindu nationalist party. (DUF ¶ 19.) Therein, the State Department warned that the textbook revisions in India reflected Hindutva beliefs and "Hindu extremist interpretations of history." (*Id.*)

Dr. Witzel's letter was signed by several renowned scholars, including Romila Thapar, the first Kluge Fellow at the U.S. Library of Congress. (DUF ¶ 20.) Dr. Thapar also sent an email to Tom Adams, Executive Director of the Commission, and Sue Stickel, Deputy Superintendent of Curriculum and Instruction, on November 7, 2005, stating that historians in India urged the SBE to consult with scholars before agreeing to make the changes to Hinduism. (DUF ¶ 20.) She and eight other Indian scholars sent a similar message on November 28, 2005. (*Id.*) Dr. Adams contacted Dr. Thapar and asked her to review the HEF/VF edits approved by Dr. Bajpai. (DUF ¶ 21.) She performed a cursory review of the edits and recommended that they should not be adopted for inclusion in the textbooks. She also recommended that the CDE seek assistance from other "serious south Asian scholars" as in her opinion, Dr. Bajpai was regarded "as a rather indifferent scholar" with minimal research background. (*Id.*)

Plaintiff asserts that the correspondence from Witzel and others supporting his views contained no evidence to support

**7.** The State Department defines Hindutva as "the politicized inculcation of Hindu religious and cultural norms to the exclusion of other religious norms. Hindutva, often synonymous with 'cultural nationalism,' excludes other religious beliefs and fosters religious intolerance." (Defs.' RJN, filed Dec. 30, 2008 [Docket # 159], Ex. D, 2003 Report at 1.)

their allegations that Dr. Bajpai and those supporting the HEF/VF edits had a political agenda. Plaintiff contends the letters contained no scholarly argument or mention of any specific edits or portions of the subject textbooks. In some respects, plaintiff states the letters were signed by scholars who had authored books for publishers submitting textbooks for evaluation by defendants. (PDF ¶s 121, 133; Green Decl., filed Dec. 30, 2008 [Docket # 161], Exs. B and C.)

On November 9, 2005, at a public meeting, the SBE adopted and approved nine of the eleven sixth grade history-social science textbooks that had applied for adoption for use in California public schools. (DUF ¶ 23.) With respect to the remaining textbooks, the SBE directed the Commission to review the proposed edits and (1) accept only those edits and corrections that improve factual accuracy; (2) accept those edits and corrections that did not contradict the edits approved on September 30, 2005 and (3) accept no additional edits and corrections. (DUF ¶ 24.)

Thereafter, the CDE staff contracted the following three additional experts, who they believed were experts in ancient India: Dr. Stanley Wolpert, of the University of California, Los Angeles, Dr. James Heitzman of the University of California, Davis, and Dr. Witzel. (DUF ¶ 25.) Plaintiff disputes that Drs. Wolpert and Witzel are experts in ancient India. (RDF ¶ 3.) Plaintiff also contends defendants did not require these panelists to meet the standards defendants normally impose on content experts. For example, defendants did not require these panelists to submit their resumes, they were not vetted by defendants in any way and they were not screened by defendants with respect to the panelists' relationships to any publishers submitting textbooks in the process. (PDF ¶s 44–46, 53.) Plaintiff points out that while Dr. Bajpai had been screened

with respect to his relationship to publishers involved in the process and defendants restricted his communications with publishers, Dr. Wolpert was not similarly screened or precluded from contact with publishers. (PDF ¶ 53, 55, 56.) At the time of his participation in the process, Dr. Wolpert was a paid consultant for one of the publishers that submitted a textbook for adoption by defendants. (PDF ¶ 57.)

Additionally, plaintiff asserts that various Hindu groups brought to defendants' attention certain derogatory remarks Dr. Witzel had made about Hindus, Hinduism and Indians, but defendants took no action and continued to involve Witzel in the process. (PDF ¶s 102, 103, 107, 108.) Finally, plaintiff maintains that a November 22, 2005 document created by Drs. Witzel, Wolpert and Heitzman evidence their disdain for scholarship and hostility towards Hindus. For example, in that document, in response to a request to correct the dates of authorship of two Hindu epics, the experts wrote, "Who in Sixth Grade cares which epic was 'written' first?" (PDF ¶ 114.) In that same document, when Hindus requested removal of a picture of an alleged untouchable coming out of a garbage dump in which a pig is scavenging, the three experts wanted to modify the image to read "leaving us with a powerful picture of the scavenging lifestyle associated with untouchability." (PDF ¶ 116.)

Drs. Witzel, Wolpert and Heitzman reviewed the edits submitted by HEF and VF and provided their recommendations to the Commission. (DUF ¶ 25.) Based on a report from these three reviewers, the CDE staff prepared a document to help the Commission understand the issues of historical accuracy and decide what edits reflected a scholarly consensus. (DUF ¶ 26.)

On December 2, 2005, the Commission reviewed the proposed edits and the ex-

perts' input and made its own recommendations to the SBE. (DUF ¶ 27.) The Commission modified a number of edits, either keeping the original language of the textbooks or approving new language in many instances in direct conflict with the recommendations provided by Drs. Witzel, Wolpert and Heitzman. CDE staff calculated that 97 of the 153 Commission recommended edits were directly contrary to the recommendations provided by Drs. Witzel, Wolpert and Heitzman. (*Id.*) Shortly thereafter, the SBE received a letter, dated December 7, 2005, signed by an additional 130 scholars protesting the Commission's decision to reject the scholarly recommendations of Drs. Witzel, Wolpert and Heitzman. (DUF ¶ 30.) The letter expressed concern "that a small, but highly organized group of people who claim to speak for all 'Hindus,' seem to have dominated" the proceedings, while a range of other organizations that represent Hindus were marginalized in the process. (*Id.*) The letter also expressed concern about the Commission's consultation with HEF and VF, "rather than trained academics on South Asia;" the scholars warned that HEF and VF were affiliated with the Hindutva extremist movement. (*Id.*) On the same day, Dr. Witzel wrote another letter on behalf of the 50 global experts who contacted the SBE on November 8, 2005, urging the SBE to reject the action of the Commission and instead adopt the Witzel, Wolpert and Heitzman edits, which were "carefully reviewed solely with a view towards historical accuracy." (DUF ¶ 29.)

Upon learning of the actions taken by the Commission on December 2, SBE President Ruth Green sent a letter to the Commissioners expressing her concern that the Commission may not have followed the November 9, 2005 SBE directives for its meeting. (DUF ¶ 31.) Green called a closed-door meeting on January 6, 2006 to discuss the textbook edits concerning Judaism, Islam, Christianity and Hinduism. (*Id.*) CDE staff, SBE and Commission members, and five content scholars, Dr. Naomi Janowitz (Judaism), Shabbir Mansuri (Islam), Dr. David Nystrom (Ancient History and Christianity), Dr. Witzel (Indian History and Sanskrit) and Dr. Bajpai (Indian History), participated. (DUF ¶ 32.) Plaintiff disputes the qualifications of some of the content scholars, including Witzel and Mansuri (who plaintiff states was simply a consultant for Houghton Mifflin's book), and complains that members of HEF/VF were not invited to this meeting. (PDF ¶ 95.) At the January 6 meeting, all of the Ad Hoc Committee edits and corrections were discussed, including the Hindu edits, which Drs. Bajpai and Witzel reviewed and debated. (DUF ¶ 33.) Plaintiff emphasizes that with respect to Judaism and Christianity, the meeting addressed only a few minor changes. In contrast, at least 83 new suggestions were made regarding the edits on Hinduism. (PDF ¶ 89.) Ultimately, Drs. Bajpai and Witzel agreed on many of the edits, with the exception of a few subject areas, which reflect the content issues raised in this litigation. (DUF ¶ 33.)

Subsequent to the meeting, an SBE committee worked with CDE staff to review all of the edits and corrections that the SBE committee deemed appropriate. (DUF ¶ 34.) CDE and SBE staff created a new set of recommendations that reflected the scholarly perspectives, public comment and SBE concerns (the "February 27 Edits and Corrections List"). (*Id.*) Four members of the SBE committee met on February 27, 2006 at a public meeting. The February 27 Edits and Corrections List was posted on the CDE website prior to the meeting. (DUF ¶ 35.) Written comments received by the public regarding the posted list were forwarded to committee members prior to the meeting. (*Id.*) Approximately 104 people gave public tes-

timony at the hearing, including CAPEEM members. (DUF ¶ 36.) Defendants maintain that those that spoke for and against the HEF/VF edits spoke for approximately equal amounts of time. (*Id.*) The SBE designated two hours for public comment, and there were additional people who would have spoken had time allowed. (*Id.*) After the two-hour public comment period, the SBE recommended approval of the edits, consistent with the SBE/CDE staff recommendations. (DUF ¶ 37.)

Plaintiff contends these new recommendations were not based on scholarly perspectives and many of the recommendations showed disdain for Hindus. (RDF ¶ 6.) At the February 27 meeting, plaintiff maintains that only the Hindu participants were required to identify themselves as either "for" or "against" the HEF/VF edits and this permitted President Green to manipulate the time allowed to those speaking against the edits. (RDF ¶ s 7–8.)

On February 27, 2006, the SBE committee recommendations were sent to the SBE for the regularly scheduled SBE March meeting. On March 8, 2006, the SBE held a public meeting; approximately 49 people addressed the SBE regarding the textbooks and proposed edits. After approximately two hours of public comment, the SBE adopted the SBE/CDE staff recommended edits to the sixth grade history-social science textbooks. (DUF ¶ 38.)

Plaintiff emphasizes that in rendering its final decision, the SBE ignored many of the recommendations of the Commission. Most glaringly, the Commission had recommended rejecting the Oxford University Press ("OUP") textbook by a 14–0 vote. (PDF ¶ 20.) CAPEEM member, Karthik Venkataramani, along with some HEF members, had met with OUP representatives, and OUP had agreed to make changes to improve the presentation of Hinduism. (PDF ¶ 23.) OUP representatives had agreed with HEF's suggestions, noting that the OUP author "was very amenable to the changes and saw merit in [HEF's] comments." (PDF ¶ 192.) Yet, ultimately, plaintiff asserts many of the more egregious portions of the OUP and other texts were not changed.[8] In contrast, the ICS worked with OUP to make changes to the chapter on Judaism which were accepted by the SBE. (PDF ¶ 22.)

Defendants maintain, on the other hand, that throughout the textbook adoption process, the SBE received extensive public comment from those both supporting and opposing the HEF/VF edits. (DUF ¶ s 39–40.) Defendants claim members of CAPEEM participated throughout the process, advocating for the HEF/VF edits in both written comments and also by par-

---

8. For example, plaintiff states one textbook describes the Hindu religious texts, the Vedas, as a "collection of poems, myths, hymns and rituals." (Defs.' Resp. to Pl.'s Stmt. of Undisputed Facts in Supp. of MSJ, filed Jan. 13, 2009 [Docket # 173] [hereinafter, "PUF"], ¶ 150.) Similarly, unlike the case of Christianity and Judaism where the origin of the religion is presented through the lens of believers and the lens of the relevant religious texts, plaintiff asserts the origin of Hinduism is not attributed to Hindu beliefs. Instead, plaintiff points out that the Holt textbook's chapter states that Hinduism was developed by people called Aryans and then gives a description of an oppressive caste system.

The chapter ends with a description of Jainism and mentions how there were people "unsatisfied" with Hinduism. (PUF ¶ s 151–152.) Plaintiff alleges the chapter on Buddhism also begins by taking a dim view and mentions how a young man was "dissatisfied with the teachings of Hinduism." (PUF ¶ 154.) Finally, plaintiff describes that the Holt textbook's chapter on Hinduism does not present any Hindu texts as historical documents. Yet that same textbook refers to the Torah as a Jewish "account" of the early history of the world, and the Gospels as the "accounts" of Jesus' life and teachings. (PUF ¶ 125.)

ticipating in the public meetings. (DUF ¶ 39.) Ultimately, defendants assert the SBE considered all perspectives equally and rendered its final decision about the HEF/VF edits based on scholarly consensus. (DUF ¶ 45.)

However, plaintiff contends, contrary to defendants, that the Hindu groups supporting the HEF/VF edits were subjected to different procedures during the process, including: (1) defendants rejected suggestions from VF that were not in the correct format, and CDE included only those VF comments that consisted of "specific edits and corrections" (PDF ¶ 6); on the other hand, the CIE, an Islamic advocacy group that participated in the process, did not provide specific edits and corrections, yet defendants came up with suggestions based on the "narrative evaluation" submitted by CIE (PDF ¶ 7); (2) defendants imposed arbitrary deadlines on Hindus supporting the HEF/VF edits, including the improper rejection of a CAPEEM member's submissions as untimely (PDF ¶ 18), and imposing special deadlines on their groups with respect to submissions to the Ad Hoc Committee (PDF ¶ 19); to the contrary, opponents of the HEF/VF edits, like Dr. Witzel, faced no similar deadlines; (3) during various public meetings, defendants asked Hindus to identify themselves as being either "for" the HEF/VF edits or "against" them before being permitted to speak (PDF ¶ 147).

Plaintiff also asserts that defendants treated Hindus supporting the HEF/VF edits differently when making decisions on content. For example, when Jewish participants objected to treating Christianity as an improvement over Judaism, defendants approved changes to correct such claims. (PDF ¶ 171.) However, when Hindu participants asked for removal of the depiction of Buddhism as an improvement over Hinduism, their requests were denied. (PDF ¶ 172.) Additionally, plain-

tiff contends that while defendants conceded the request of Jewish participants to capitalize the letter "g" in "god," similar requests by Hindus resulted in changing all instances of the words "gods" and "goddesses" to the word "deities" with respect to the Hindu religion. (PDF ¶ 176.) Plaintiff also asserts that the request of Jewish participants to provide an insider perspective of their religion, such as by using the version of the Ten Commandments from the Hebrew Bible instead of the Christian Bible and removing references to the Christian Bible in the chapter on Judaism, were granted. However, defendants did not grant requests by Hindus to provide an insider's perspective of their beliefs. (PDF ¶s 177–179.) Similarly, plaintiff points out that defendants granted the request of Jewish participants to remove references to the alleged belief of Jews having higher social status than the Samaritans, but did not grant the request of Hindu participants to remove the offensive sections of the textbooks attributing an oppressive caste system to Hinduism. (PDF ¶s 180–181.) Finally, plaintiff asserts defendants took action to ensure that Judaism was treated with sensitivity and asked the expert on Judaism to work with the expert on Christianity, when a controversy arose about blaming Jews for the arrest of Jesus. (PDF ¶ 166.) Plaintiff alleges similar sensitivity was not applied to Hinduism. (*Id.*)

Shortly after the adoption of the edits, on March 9, 2006, CAPEEM formed for the purpose of promoting "an accurate portrayal of the Hindu religion in the public education system of the State of California." (DUF ¶ 50.) CAPEEM is comprised of Hindu and Indian parents who have children currently attending public schools in the first through sixth grades in California (and will use the material approved and adopted by the SBE) and who assert their own interests as well as the

interests of their children. Certain of CAPEEM's individual member-parents participated, together with other Hindu groups, in the sixth-grade history-social science textbook adoption process. (See Mem. & Order, filed Mar. 25, 2008 [Docket # 108], at 6.)

CAPEEM filed the instant action on March 14, 2006, and filed the operative complaint, the second amended complaint, on August 25, 2006, alleging violations of the Equal Protection, Establishment and Free Speech and Association Clauses of the Constitution, pursuant to 42 U.S.C. § 1983. By the action, plaintiff "challenges the derogatory and unequal treatment of the Hindu religion in social sciences textbooks used in the sixth grade in the California public education system." (SAC ¶ 1.1.)[9] More specifically, plaintiff challenges defendants' refusal to revise certain textbooks to remove allegedly offensive and derogatory references to the Hindu religion. "Plaintiff challenges the substance of the final edits as well as the (disparate) procedures followed by Defendants in adopting certain edits and reject-

ing others." (SAC ¶ 1.2.) Plaintiff seeks injunctive relief with respect to its claims prohibiting defendants from:

1. "treating Plaintiff or its members differently because of their religion, ethnicity, political beliefs, or national origin;"

2. "promoting other religions (and portraying other religions in a more favorable light) at the expense of the religious beliefs of plaintiff and its members;"

3. "denigrating the religious beliefs of Plaintiff and its members;"

4. "utilizing creationist, Judeo–Christian–based theories to explain the development of Hinduism and the migrations of ancient Hindus; and"

5. "taking adverse action against Plaintiff or its members based on their protected expression, political beliefs, or association[.]"

(SAC at 24:12–20.)[10]

## STANDARD[11]

Summary judgment is appropriate when it is demonstrated that there exists no

---

9. At times on these motions, plaintiff asserts arguments challenging certain *seventh* grade textbooks. Said textbooks are not at issue in the instant action as the complaint raises issues pertaining only to the adoption of certain sixth grade history-social science textbooks. Fed.R.Civ.P. 8 (requiring that the complaint provide the defendant with a short and plain statement of the claims against it). As such, the court has not considered plaintiff's arguments directed at any seventh grade textbooks.

10. On March 16, 2006, the Hindu American Foundation ("HAF") initiated a parallel action in state court seeking a writ of mandate. HAF alleged (1) procedural violations of California's APA, arguing the procedures through which defendants reviewed and approved the textbooks were not conducted under regulations formally promulgated under the State's APA, and California's Bagley–Keene Open Meeting Act, based on the SBE's failure to

hold public meetings, and (2) content-based violations under California's Education Code, arguing the textbooks are not in compliance with the substantive, state legal standards applicable to their content. The court ultimately rejected HAF's content based claims but found that the textbook adoption process was flawed because the governing regulations had not been properly promulgated under the State's APA. (DUF ¶ 49.) As a result of the state court's decision, CDE promulgated new regulations for the textbook adoption process, which will be utilized in future textbook adoptions. *Id.*

11. The court does not set forth the standard for cross-motions for summary judgment because as set forth above, while both parties move for summary judgment with respect to plaintiff's Establishment Clause claim, they move with respect to different theories of plaintiff's claim.

genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* at 324, 106 S.Ct. 2548. Indeed, summary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. 2548. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323, 106 S.Ct. 2548.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288–289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed.R.Civ.P. 56(e). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 251–52, 106 S.Ct. 2505.

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank*, 391 U.S. at 289, 88 S.Ct. 1575. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (quoting Rule 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir.1982). The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Nevertheless, inferences are not drawn out

**1106**

of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines,* 602 F.Supp. 1224, 1244–45 (E.D.Cal.1985).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. 1348.

## ANALYSIS

### 1. *Plaintiff's Motion for Partial Summary Judgment*

CAPEEM's motion for partial summary judgment challenges the adopted textbooks' alleged indoctrination of students in their portrayals of Christianity and Judaism. Defendants oppose the motion, in the first instance on standing grounds, arguing CAPEEM lacks "organizational" standing to bring a claim challenging the textbooks' portrayal of religions other than Hinduism.

■■■ On a motion for summary judgment, the plaintiff bears the burden of establishing each element of standing. *Churchill County v. Babbitt,* 150 F.3d 1072, 1077 (9th Cir.1998). Establishing standing is an essential part of the case or controversy requirement of Article III of the United States Constitution. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). An organization may have standing to sue on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests

the association seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit. *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 342–43, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

■■■ Here, CAPEEM cannot challenge the textbooks' portrayal of religions other than Hinduism because such a challenge is not germane to its organizational purpose.[12] According to CAPEEM's Articles of Incorporation, its primary organizational purpose is:

> to promote an accurate portrayal of the Hindu religion in the public education system of the State of California.

(DUF ¶ 50.) CAPEEM has consistently maintained that its purpose is to ensure the accurate representation of Hinduism in the subject textbooks. (Linton Decl. in Opp'n to Pl.'s MSJ, filed Jan. 13, 2009 [Docket # 170], Ex. B [CAPEEM Articles of Incorp., Bylaws and IRS description].) Consistent with that purpose, CAPEEM filed this lawsuit to challenge the "derogatory and unequal treatment of the Hindu religion in social sciences textbooks used in the sixth-grade in the California education system." (SAC ¶ 1.1.) It has repeatedly represented that this lawsuit is about challenging the portrayal of Hinduism in the textbooks. (Linton Decl., Ex. B [description of lawsuit from CAPEEM's website, fund-raising fliers about lawsuit and information sheet for fund-raisers].) For example, CAPEEM's website states:

> The objective of this lawsuit is to correct the sixth grade social studies textbooks to end selective discrimination against

---

**12.** All three prongs of the *Hunt* test must be satisfied to find that an organization has standing to assert an action on behalf of its members. Because CAPEEM cannot establish the second requirement, the court need not consider the other elements. *See Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dept. Of Ag.,* 415 F.3d 1078, 1103–04 (9th Cir.2005).

Hinduism in textbooks, protect the civil rights of Hindu children, ensure that Hindu children are not alienated from their traditions because of negative portrayals of their religion, removal colonial stereotypes regarding Hinduism, and present the positive aspects of Hinduism so that Hindu children can be proud of their heritage.

(Linton Decl., Ex. B [CAPEEM00055].)

In *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dept. Of Ag.*, 415 F.3d 1078, 1103–04 (9th Cir.2005), the Ninth Circuit dismissed an association's National Environmental Protection Act ("NEPA") claims on standing grounds, finding that the association's purpose of representing cattle producers on issues of trade and marketing was not germane to its NEPA claims. The situation in this case is analogous. In contrast to its stated organizational purpose and the self-identified purpose of this lawsuit, CAPEEM's motion focuses on claims of Christian and Jewish indoctrination. Such claims are not germane to its stated purpose of promoting an accurate portrayal of Hinduism in textbooks used in California public schools. As such, the court must find that plaintiff lacks standing to adjudicate issues regarding the textbooks' portrayal of religions other than Hinduism. *See also Pacific Northwest Generating Cooperative v. Brown*, 38 F.3d 1058, 1063 (9th Cir.1994) (finding that although the organizational plaintiff asserted environmental injuries to it and its employees, it lacked standing to bring environmental claims because its organizational purpose was economic and not environmental); *accord Consejo de Desarrollo Economico de Mexicali, AC v. United States*, 438 F.Supp.2d 1194, 1203 (D.Nev.2006) (finding the plaintiff organization lacked standing to press environmental claims as its stated purpose was to promote the economic interests of its members in Mexicali, Baja California, Mexico); *Minnesota Federation of Teachers v. Randall*, 891 F.2d 1354, 1359 (8th Cir.1989) (finding insufficient nexus existed between the purposes and activities of the plaintiff teachers' union and the tax issues raised in the complaint, and thus, the plaintiff failed to satisfy the "germaneness" prong of the *Hunt* test).

Plaintiff does not discuss the above case law in any respect on the motion; indeed, plaintiff offers no authority whatsoever in support of its bald assertion that it can satisfy the germaneness requirement for this claim. Instead, CAPEEM simply proffers the testimony of its director and one member who testified at their depositions in this case, that CAPEEM was formed, in part, to prevent religious indoctrination. (Balasubramani Supp. Decl., filed Jan. 23, 2009 [Docket # 197], Exs. A and B.) Such self-serving statements made in support of this legal action are insufficient to meet plaintiff's burden under *Hunt*. *See e.g. Animal Lovers Volunteer Assoc., Inc. v. Weinberger*, 765 F.2d 937, 939 (9th Cir.1985) (animal-lovers association lacked standing to challenge Navy's shooting of feral goats where it "has no history which antedates the legal action it seeks to bring, and can point to no activities which demonstrate its interest, other than pursuing a legal action"). Other than these self-serving statements, CAPEEM can point to no organizational document (articles of incorporation or bylaws or any amendments thereto), written policies of the organization, meeting minutes or any other document which supports a finding that CAPEEM's organizational purpose is to challenge the textbooks' alleged indoctrination of religion, particularly the Christian and Jewish religions as asserted in its motion.

Moreover, that certain CAPEEM members have concerns, some of which were raised during the textbook adoption process, that the subject textbooks attempt to

indoctrinate students into the Christian and Jewish religions does not establish that CAPEEM's *organizational* purpose is to prevent such indoctrination. (*See* Pl.'s Reply, filed Jan. 23, 2009 [Docket # 198], at 1 [describing a CAPEEM member's deposition testimony that he had concerns that the contents of the textbooks and the Content Standards amounted to indoctrination and pointing out that CAPEEM's director raised his indoctrination concerns during the textbook adoption process].) Additionally, while CAPEEM did reference in its complaint the textbooks' treatment of the Christian and Jewish religions, it was done in order to substantiate CAPEEM's claims of disparate treatment of the Hindu religion. In other words, the references to Christianity and Judaism were used as a comparative tool to establish that the Hindu religion was treated in a discriminatory manner. As stated clearly at the outset of plaintiff's complaint:

> This case challenges the derogatory and unequal treatment of the Hindu religion in social science textbooks used in the sixth grade in the California public education system.

(SAC ¶ 1.1.) The treatment of other religions is relevant only as it relates to establishing the unequal and discriminatory treatment of Hinduism. CAPEEM formed in order to bring this lawsuit, designating its organizational purpose as the promotion of "an accurate portrayal of the Hindu religion in the public education system of the State of California." (DUF ¶ 50.) As such, because CAPEEM's claim of alleged unlawful indoctrination of students into the Christian and Jewish religions is not germane to this organizational purpose, the court must find that CAPEEM lacks standing to bring this claim.

■ Because the claim is not germane to its purpose, CAPEEM's allegations regarding indoctrination by the textbooks represents a mere "generalized grievance"

that any citizen might attempt to litigate simply because he or she takes offense at the textbooks. Such generalized grievances "shared in substantially equal measure by all or a large class of citizens" are insufficient to establish standing. *See Warth v. Seldin,* 422 U.S. 490, 498–500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Plaintiff's motion for partial summary judgment is therefore DENIED.

### 2. *Defendants' Motion for Summary Judgment*

#### a. Standing

■ In moving for summary judgment, as its threshold argument, defendants contend plaintiff lacks standing to bring its claims for relief to the extent they are based on (1) the textbook adoption process and (2) the textbooks' contents in so far as the books pertain to the portrayal of religions other than Hinduism. Defendants concede that CAPEEM has standing to bring its claims for relief to the extent they challenge the textbooks' portrayal of Hinduism. For the same reasons as set forth above, the court agrees with defendants that CAPEEM lacks standing to bring its Equal Protection, Establishment, and Free Speech and Association Clause claims to the extent they are based on the textbooks' portrayal of religions other than Hinduism, as such claims are not germane to CAPEEM's organizational purpose.

■ Thus, the court considers here only whether CAPEEM has standing to assert its claims for relief based on alleged disparate treatment in the textbook adoption process. Again, an association has standing to bring suit on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests the association seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the par-

ticipation of individual members in the lawsuit. *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Under the first prong of the *Hunt* test, plaintiff must allege facts supporting its members standing in their own right. *Id.* To allege individual standing, a plaintiff must state facts demonstrating: (1) a concrete and particularized injury in fact that is actual or imminent; (2) a causal connection between the injury and the defendants' conduct or omissions; and (3) the likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. at 555, 560, 112 S.Ct. 2130 (1992). With regard to the adoption process, defendants argue CAPEEM cannot meet either the first or third requirement.

▮ Defendants contend plaintiff cannot show an actual injury to any of its members nor can it demonstrate that its members were denied the opportunity to equally compete for a government benefit. In *Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993), the United States Supreme Court recognized that a claim of discriminatory treatment, without any showing of actual injury, may be sufficient to establish standing when a defendant creates a barrier to a potential benefit. In *City of Jacksonville,* the Court found a group of contractors had standing based on the alleged denial of equal footing in a government bidding process. *Id.* Defendants contend plaintiff has no evidence of direct injuries to its members, and thus, must rely on *City of Jacksonville* to establish standing. But, defendants maintain in this case, the government did not erect any barriers to CAPEEM members' participation in the adoption process or deny CAPEEM members a benefit to which they were entitled, and thus, CAPEEM cannot establish standing under this latter theory.

Defendants are incorrect in both respects. Plaintiff offers evidence of direct injury to at least one of its members. CAPEEM asserts defendants did not afford one of its members an opportunity to participate on an equal basis in the textbook adoption process, and that conduct resulted in the humiliation of the member. (PDF ¶s 27.) This member's testimony describing his feelings of humiliation and alienation as a result of the alleged disparate treatment he received in the adoption process is sufficient to establish the injury-in-fact requirement of *Lujan.* Moreover, even without this claim of direct injury to a member, CAPEEM can establish an injury in fact under *City of Jacksonville.* Defendants' conduct during the adoption process was governed by a body of laws, regulations and guidelines which apply to the SBE's adoption of new textbooks. Cal. Const. Art. IX, § 7.5; Cal. Educ.Code §§ 60200–60206, 60040, 60044;(Adams Decl., [Docket # 160], at Ex. B [Framework and Content Standards].) That regulated process is akin to the government bidding process in *City of Jacksonville.* Plaintiff proffers evidence that defendants applied the laws and rules governing the process in an arbitrary manner toward those participants who supported the HEF/VF edits; this disparate treatment, plaintiff alleges, resulted in the adoption of materials that denigrate the Hindu religion. Thus, plaintiff can establish under *City of Jacksonville,* that they were denied the opportunity of equal and fair participation in the process, and they ultimately lost the benefit of having their views heard and given equal consideration in an open process. For these reasons, the court finds that plaintiff can establish the injury-in-fact requirement for standing.

▮ As to the third requirement, defendants contend that because the State has promulgated new regulations for the

textbook adoption process, which will be utilized in future textbook adoptions, plaintiff cannot show that its members' injuries will be redressed by a favorable decision in this case. Defendants' argument ignores the purpose of this litigation. CAPEEM's complaints are not directed at the governing rules themselves but how those rules are applied by defendants. CAPEEM seeks to ensure that in future adoption processes, the rules, whatever they may be, are *applied* in a fair and equal manner toward Hindus participating in the process. Thus, plaintiff requests injunctive relief in this case prohibiting, among other things, defendants from "treating [p]laintiff or its members differently [in the textbook adoption process] because of their religion, ethnicity, political beliefs, or national origin;" "denigrating the religious beliefs of [p]laintiff and its members;" and/or "taking adverse action against [p]laintiff or its members based on their protected expression, political beliefs, or association." (SAC at 24:12–20.) Such in-

junctive relief would redress plaintiff's claimed injuries in this case, and thus, the court finds that the third requirement for individual standing is met.[13]

Accordingly, defendants' motion on standing grounds is DENIED.[14]

### b. Equal Protection Clause Claim [15]

 CAPEEM alleges defendants violated the Equal Protection Clause by discriminating against its members on the basis of their religion, political affiliation, ethnicity and national origin. (SAC ¶s 5.3–5.4.) The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amdt. 14, § 1. This is "essentially a direction that all similarly situated persons should be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). The guarantee of equal protection is not a source of substantive rights or liberties, but rather "a right

---

**13.** Though not fully developed in their papers, defendants appear to argue as an additional basis for finding a lack of standing, that plaintiff cannot demonstrate a likelihood of future harm. Defendants are correct that even when seeking prospective relief, a plaintiff must still satisfy the "imminence" requirement for Article III standing and demonstrate that its injury is currently impending. *Scott v. Pasadena Unified Sch. Dist.,* 306 F.3d 646, 658 (9th Cir.2002). It is insufficient for a plaintiff to demonstrate a past injury. However, to meet the third requirement for individual standing, a plaintiff need only show a significant *possibility* of future harm to establish that its injury may be redressed by a favorable decision. *Steel Co. v. Citizens for a Better Envirn.,* 523 U.S. 83, 109, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Construing the evidence proffered by plaintiff in the light most favorable to CAPEEM, plaintiff has shown that based on defendants' extensive and egregious, past conduct toward the Hindu participants supporting the HEF/VF edits, unless enjoined herein, said conduct is substantially likely to recur.

**14.** Defendants did not argue that plaintiff could not establish the other two elements of the *Hunt* test, with respect to plaintiff's challenges to the adoption process involving issues pertaining to Hinduism, and therefore, the court does not discuss the elements of germaneness and necessity of individual participation.

**15.** All of plaintiff's constitutional claims are brought pursuant to 42 U.S.C. § 1983. Section 1983 provides in part that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ...." Section 1983 confers no substantive rights itself, but rather, "provides remedies for deprivations of rights established elsewhere." *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985).

to be free from discrimination in statutory classifications and other governmental activity." *Williams v. Vidmar,* 367 F.Supp.2d 1265, 1270 (N.D.Cal.2005). "[D]iscrimination cannot exist in a vacuum; it can only be found in the unequal treatment of people in similar circumstances." *Freeman v. City of Santa Ana,* 68 F.3d 1180, 1187 (9th Cir.1995). Thus, to prove an equal protection violation, a plaintiff must show that the defendant acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class. *Thornton v. City of St. Helens,* 425 F.3d 1158, 1166–67 (9th Cir.2005).

Here, defendants argue (1) CAPEEM cannot challenge the textbooks' contents under the Equal Protection Clause, and (2) CAPEEM cannot produce evidence, sufficient to withstand summary judgment, demonstrating defendants intended to discriminate against CAPEEM's members during the adoption process. With respect to defendants' first argument, plaintiff alleges that the adopted textbooks' content violates the Equal Protection Clause. (SAC ¶s 5.6, 5.8, 5.10, 5.12; Linton Decl. in Supp. of Defs.' MSJ, filed Dec. 30, 2008 [Docket # 162], Ex. C [Interrog. Resps. 8, 12, 16].)[16] This claim must fail, however, because the State has the discretion to determine the content of its curriculum, and the Equal Protection Clause does not provide a basis to challenge such curriculum decisions. *Monteiro v. Tempe Union High Sch. Dist.,* 158 F.3d 1022, 1032 (9th Cir.1998); *see also Downs v. L.A. Unified Sch. Dist.,* 228 F.3d 1003, 1013 (9th Cir.2000) (finding no equal protection violation because the plaintiff could not dictate contents of school's speech).

In *Monteiro,* a parent brought an equal protection challenge to her child's high school curriculum based on race. The curriculum allegedly caused African-American students to suffer psychological injuries and lost educational opportunities due to required reading that contained "repeated use of the profane, insulting and racially derogatory term 'nigger.'" 158 F.3d at 1024. None of the required reading referred to Caucasians in a derogatory manner. *Id.* The Ninth Circuit held that the Equal Protection Clause will not support a challenge to the curriculum even where its contents are allegedly discriminatory. *Id.* at 1022.

Similarly, here, CAPEEM maintains that the textbooks are discriminatory against Hindus and will result in psychological harm and lost educational opportunities for Hindu students. *Monteiro* squarely forecloses an equal protection claim on this basis. Accordingly, to the extent plaintiff bases its equal protection claim on a challenge to the textbooks' contents themselves, defendants' motion for summary judgment is GRANTED.

Plaintiff also brings its equal protection claim on the basis of alleged disparate treatment of CAPEEM members in the textbook adoption process. As to this process claim, defendants assert plaintiff fails to produce sufficient evidence that (1) defendants acted with discriminatory intent; (2) a similarly situated group was treated more favorably; and (3) CAPEEM's mem-

---

**16.** In opposing defendants' motion, plaintiff appears to concede this claim is not viable under *Monteiro,* described below. (Pl.'s Opp'n to Defs.' MSJ, filed Jan. 14, 2009 [Docket # 193–2], at 15–16.) Plaintiff argues only that *Monteiro* does not foreclose its equal protection claim directed at improprieties in the textbook adoption process. Defendants do not contend *Monteiro* precludes plaintiff's process-related equal protection claim. Because plaintiff clearly alleged its equal protection claim, in part, on the basis of the textbooks' contents, as stated in its second amended complaint and in discovery responses, the court briefly addresses whether such a claim is viable herein.

bers were treated differently in the process. The court addresses each of these arguments in turn below:

### (1) Discriminatory Intent

▉ First, proof of discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 194, 123 S.Ct. 1389, 155 L.Ed.2d 349 (2003). Discriminatory intent "implies that the decision maker ... selected or reaffirmed a particular course of action at least in part 'because of' not merely 'in spite of' its adverse effects upon an identifiable group." *Personnel Adm'r v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). In this case, contrary to defendants' protestations that CAPEEM has "no evidence" of defendants' discriminatory intent, CAPEEM proffers sufficient evidence, in the form of certain direct statements evidencing hostility toward certain Hindu groups and procedural irregularities that impacted only the Hindu groups supporting the HEF/VF edits, to raise triable issues of fact that defendants intentionally discriminated against CAPEEM members in the adoption process.

For example, CAPEEM proffers evidence of certain procedural irregularities that only effected Hindu groups supporting the HEF/VF edits: (1) these Hindu groups' recommended edits were subject to formatting requirements which other religious groups' edits were not subjected (PDF ¶s 6–8); (2) the suggestions of these Hindu groups were subject to arbitrary deadlines which other religious groups were not subjected (PDF ¶ 17); (3) while certain controversies concerning the textbooks' contents involved religions other than Hinduism, defendants only brought in experts opposed to the Hindu groups in order to evaluate the Hindu groups' suggested edits (PDF ¶s 13, 17, 47–48, 67, 70, 166, 184–186);[17] (4) defendants fully vetted Dr. Bajpai, who supported the HEF/VF edits, but they did not do the same for the experts they hired who opposed the edits, and defendants imposed special requirements only on Dr. Bajpai and not on the experts opposing the edits, which included disallowing Dr. Bajpai from having any connection to the advocacy groups supporting the HEF/VF edits and precluding him from having any relationship with publishers submitting textbooks in the process (PDF ¶s 44–46, 49, 51–56, 59, 60);[18] (5) various edits suggested by these Hindu groups which were similar to edits suggested by other religious groups were nonetheless treated differently, including (a) while the requests of Jewish groups to capitalize the "g" in "god" were granted the same request of the Hindu groups was not (PDF ¶s 175–176); (b) the request of Jewish participants to remove text related to a claimed higher social status of Jews with respect to Samaritans was removed but the alleged offensive text which blamed Hinduism for an oppressive caste system was not removed (PDF ¶s 180–181); (c) defendants removed claims of Christianity being an improvement over Judaism when Jewish participants complained but defendants denied the Hindu groups' request to remove claims of Bud-

---

17. To contrary, plaintiff proffers evidence that the advisors for Christianity, Islam and Judaism, Nystrom, Mansuri and Janowitz, were not hostile to these religions. (*Id.*)

18. The experts opposing the HEF/VF edits were not put to the same requirements. For example, plaintiff proffers evidence that Wol-

pert acted as a consultant to one of the publishers submitting a textbook in the process at the same time he served as a panelist on the Ad Hoc Committee. Defendants conceded in this litigation that such a dual role presented a conflict of interest. (*See* Defs.' Reply on MSJ, filed Jan. 23, 2009, at 6–7; PDF ¶s 61–62.)

dhism being an improvement over Hinduism (PDF ¶s 172–174, 220); and (d) defendants granted the requests of Jewish participants to provide an insider's perspective of their religion, such as by using the version of the Ten Commandments from the Hebrew Bible instead of the Christian Bible and removing references to the Christian Bible in a chapter on Judaism, but defendants denied the Hindu groups' similar requests to provide an insider's perspective of their beliefs (PDF ¶s 177–178).

In addition to these procedural irregularities which CAPEEM proffers as circumstantial evidence of defendants' discriminatory intent toward the Hindu groups supporting the HEF/VF edits, CAPEEM also provides evidence of certain statements, which when viewed in the light most favorable to plaintiff, evidence hostility toward the Hindu groups. Said evidence includes the following: (1) defendants were aware of Dr. Witzel's alleged biases toward the Hindu groups as a result of statements Witzel made to Tom Adams and as a result of information the Hindu groups provided to defendants about Witzel's derogatory statements toward the Hindu groups, yet defendants continued to consult Witzel and involve him in the process (PDF ¶s 108, 112);[19] (2) defendants accused "[HEF/VF] ... [of] theological tweaking" (PDF ¶ 258); (3) Charles Munger, a member of the Commission, called the HEF/VF edits "foolish" (PDF ¶ 100); and (4) Tom Adams called VF member Janeshwari Devi's comments a "nationalist interpretation of Indian history," despite the fact that Devi is from the United States, and Adams testified he did not think she was of Indian descent (PDF ¶ 31).

These facts sufficiently raise a triable issue as to defendants' intent in considering the positions of the Hindu groups who supported the HEF/VF edits. While defendants may well contend that such evidence is insufficient for plaintiff to *prevail* on its equal protection claim, that argument goes to the weight of this evidence, which is ultimately an issue for the trier of fact to consider. (Defs.' Reply, filed Jan. 23, 2009 [Docket # 200], at 5–9.) At this juncture, the court must construe the evidence proffered by plaintiff in the light most favorable to plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (holding that in resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party). In the end, to withstand summary judgment, plaintiff must only raise sufficient facts to support a reasonable trier of fact's verdict in its favor. *Id.* at 251, 106 S.Ct. 2505 ("Before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.") *Id.* at 251, 106 S.Ct. 2505 (citations omitted). Plaintiff has done so here.

### (2) Similarly Situated Group

 Defendants also argue that CAPEEM's equal protection challenge to the adoption process must fail because it does not identify a similarly situated group of persons who allegedly received more favorable treatment. According to defendants, it was only the various Hindu

---

19. Defendants' argument that they cannot be held liable for the alleged biases of Dr. Witzel, a "third-party" to this litigation, is unavailing. Defendants hired Witzel as an advisor in this process; any alleged biases he had, of which defendants were aware are relevant to this case; specifically, whether defendants intended to discriminate against plaintiff.

groups supporting the HEF/VF edits that "invoked [an] international response from scholars," warning the SBE that the groups' suggested edits were not accepted by mainstream practitioners and instead advanced a sectarian, religious-political agenda. (Defs.' Mem. of P. & A. in Supp. of MSJ, filed Dec. 30, 2008 [Docket # 157], at 17.) While defendants are correct that discrimination, actionable under the Equal Protection Clause, may be found only in the unequal treatment of people in similar circumstances, defendants read this requirement too narrowly here. *See Freeman v. City of Santa Ana,* 68 F.3d 1180, 1187 (9th Cir.1995). CAPEEM is not required to show that a similar group of persons' suggested edits faced the same international challenge as the Hindu groups' edits; rather, CAPEEM is required to show simply that the Hindu groups' suggested edits were akin to other groups participating in the adoption process but received disparate treatment. As set forth above, CAPEEM has raised sufficient evidence on this issue to create a genuine issue for trial. CAPEEM proffers evidence of certain procedural irregularities that applied only to its members as opposed to other groups, including other Christian and Jewish persons participating in the same adoption process in similar ways to CAPEEM's members. Like the above, this evidence is sufficient to meet CAPEEM's burden on summary judgment.

### (3) Disparate Treatment from Other Similarly Situated Group

■ Finally, defendants argue that even if plaintiff can adequately identify a group of similarly situated persons, it cannot establish that it was treated less favorably than these other persons in the textbook adoption process. Defendants contend all participants in the process, including the Hindu groups supporting the HEF/VF edits, received an equal opportunity to participate in the process. Again, for the same reasons as set forth above, CAPEEM proffers sufficient evidence to raise a material issue of fact concerning whether its members received the same opportunity to participate in the process as other religious groups. Viewed in the light most favorable to plaintiff, the evidence shows that only the Hindu groups supporting the HEF/VF edits were subjected to certain, more strenuous procedures and standards. *See Flores v. Pierce,* 617 F.2d 1386, 1389 (9th Cir.1980) (recognizing that the deviation from previous procedural patterns and the adoption of an ad hoc method of decision making without reference to fixed standards, among other things, were sufficient to raise an inference of discriminatory animus on an equal protection claim).

Accordingly, for all of the above reasons, defendants' motion for summary judgment as to plaintiff's equal protection claim challenging the textbook adoption process is DENIED.[20]

---

**20.** As their final argument directed at plaintiff's equal protection claim, defendants contend that even if plaintiff could make a showing that its members were treated differently than similarly situated groups, the SBE's actions toward plaintiff's members was done to avoid a violation of the Establishment Clause, and thus, defendants have a defense to liability under the Ninth Circuit's "Establishment Clause defense"-jurisprudence. *Hills v. Scottsdale Unified Sch. Dist.,* 329 F.3d 1044, 1053 (9th Cir.2003) (recognizing that Establishment Clause concerns can justify certain speech restrictions in order to avoid the appearance of government sponsorship of religion.) Thus, the Ninth Circuit has recognized in certain contexts a defense to an equal protection claim, where a government defendant can show its actions were done to ensure compliance with the Establishment Clause. Here, defendants maintain the SBE's treatment of the HEF/VF edits was done to ensure that the edits were neutral, accurate and did not endorse a particular religion. However, the defense recognized in *Hills* only applies

#### c. Establishment Clause Claim

The Establishment Clause provides: "Congress shall make no law respecting an establishment of religion ...." U.S. Const. amend. I, cl. 1. The prohibition of the Establishment Clause applies to state governments through the Fourteenth Amendment. *Everson v. Board of Education*, 330 U.S. 1, 8, 67 S.Ct. 504, 91 L.Ed. 711 (1947). The United States Supreme Court has held:

> the Establishment Clause [has come] to mean that government may not promote or affiliate itself with any religious doctrine or organization, may not discriminate among persons on the basis of their religious beliefs and practices, may not delegate a governmental power to a religious institution, and may not involve itself too deeply in such an institution's affairs.

*County of Allegheny v. ACLU*, 492 U.S. 573, 590–91, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (footnotes omitted).

[27] As decreed by the Supreme Court, and followed in the Ninth Circuit,[21] claims brought under the Establishment Clause are analyzed under the three-part "Lemon Test." *See Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Under the *Lemon* analysis, a statute or practice which touches upon religion must (1) have a secular purpose; (2) must neither advance nor inhibit religion in its principal or primary effect; and (3) must not foster an excessive entanglement with religion. *County of Allegheny*, 492 U.S. at 592, 109 S.Ct. 3086; *see Lemon*, 403 U.S. at 612–13, 91 S.Ct. 2105.

In its complaint, CAPEEM alleges that defendants violated the Establishment Clause when it adopted the instructional materials and final edits, which are allegedly biased against Hinduism and treated other religions more favorably and accurately. (SAC ¶ 6.3–6.6, 6.9–6.10.) In addition, CAPEEM alleges defendants violated the Establishment Clause during the adoption process by imposing "special hurdles" for the Hindu groups and Hindu expert, Dr. Bajpai, and by using experts allegedly biased against the Hindu groups supporting the HEF/VF edits. (SAC ¶ 6.7–6.8.) Defendants move for summary judgment as to both theories of plaintiff's claim. However, in opposing defendants' motion, plaintiff addresses only whether it can establish an Establishment Clause violation based on the textbooks' contents themselves.

Plaintiff does not separately argue, or provide evidence to support, an Establishment Clause violation based on the textbook adoption process. (Pl.'s Opp'n to Defs.' MSJ at 22–33; Defs.' Reply on MSJ at 12:17–18.) Therefore, the court construes plaintiff's failure to respond as a non-opposition to that portion of defendants' motion. E.D. Cal. L.R. 78–230(c). Accordingly, the court addresses only whether plaintiff has raised a triable issue of fact that the subject textbooks violate the Establishment Clause.

Before applying the *Lemon* test, several preliminary issues are worth noting. As an initial matter, in assessing defendants' motion, the court has considered that alleged violations of the Estab-

---

where the government actor proves that the Establishment Clause would have been violated had the activity at issue been allowed to proceed. *Id.* at 1053; *see also Nurre v. Whitehead*, 520 F.Supp.2d 1222, 1237 n. 20 (W.D.Wash.2007). Defendants wholly fail to make this showing here. Defendants provide no analysis, let alone evidence, to demon-

strate that the State's adoption of the HEF/VF edits, themselves, would have violated the Establishment Clause. As such, the court summarily dismisses defendants' argument.

21. *See Brown v. Woodland Jt. Unif. Sch. Dist.*, 27 F.3d 1373, 1378 (9th Cir.1994); *Kreisner v. San Diego*, 1 F.3d 775, 780 (9th Cir.1993).

lishment Clause in elementary school settings present heightened concerns for courts. The United States Supreme Court has made this clear in its treatment of similar cases. *See e.g., Grand Rapids Sch. Dist. v. Ball,* 473 U.S. 373, 390, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985) (noting that "[t]he symbolism of a union between church and state is most likely to influence children of tender years, whose experience is limited and whose beliefs consequently are the function of environment as much as free and voluntary choice"); *Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 2658, 120 L.Ed.2d 467 (1992) (recognizing the "subtle coercive pressure in the elementary public schools"); *Edwards v. Aguillard,* 482 U.S. 578, 584, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (stating that the sources of this coercive power are "mandatory attendance, . . . students' emulation of teachers as role models, and the children's susceptibility to peer pressure"). Therefore, this court recognizes it must be "vigilant in monitoring compliance with the Establishment Clause in elementary schools." *Edwards,* 482 U.S. at 583–84, 107 S.Ct. 2573.

 However, the court is also mindful that this heightened concern is balanced to a great degree by the broad discretion of a school board to select its public school curriculum. *Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). The Supreme Court has emphasized, in such cases as this, that courts should inject themselves in a controversy regarding the daily operation of a school system only if basic constitutional values are "directly and sharply implicate[d]." *Id.* at 104–05, 89 S.Ct. 266. Thus, in *Abington Sch. Dist. v. Schempp,* 374 U.S. 203, 300, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring), the Court

recognized that teaching many social sciences requires mentioning religions, but decisions about how religion is used "are matters which the courts ought to entrust very largely to the experienced officials who superintend our Nation's public schools. They are experts in such matters, and we are not."

In the context of this balance, courts have held a number of activities to be violations of the Establishment Clause, including: (1) inviting clergy to offer invocation and benediction prayers at formal graduation ceremonies for high schools and middle schools (*Lee,* 505 U.S. at 577, 112 S.Ct. 2649); (2) daily readings from the Bible (*Abington Sch. Dist.,* 374 U.S. at 203, 83 S.Ct. 1560); (3) daily recitation of the Lord's Prayer (*id.*); (4) distributing Gideon Bibles to fifth grade public school students (*Berger v. Rensselaer Central Sch. Corp.,* 982 F.2d 1160, 1171 (7th Cir. 1993)); (5) posting the Ten Commandments in every classroom (*Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1981)); (6) requiring the teaching of evolution science with creation science or not at all (*Edwards,* 482 U.S. at 578, 107 S.Ct. 2573); (7) beginning school assemblies with prayer (*Collins v. Chandler Unified Sch. Dist.,* 644 F.2d 759 (9th Cir.1981)); (8) teaching a Transcendental Mediation course that includes a ceremony involving offerings to a deity (*Malnak v. Yogi,* 592 F.2d 197 (3rd Cir.1979)); (9) teaching of weekly religious education classes by private religious educators in public elementary school classrooms (*Vaughn v. Reed,* 313 F.Supp. 431 (W.D.Va.1970)); and (10) teaching of the Bible, for an express religious purpose, in public elementary and high schools by private religious educators (*Herdahl v. Pontotoc County Sch. Dist.,* 933 F.Supp. 582 (N.D.Miss.1996)).[22]

**22.** In opposing defendants' motion, plaintiff relies primarily on *Vaughn* and *Herdahl.* However, for the reasons set forth below, these cases are easily distinguishable from this case.

Courts have not been inclined to find an Establishment Clause violation, however, with respect to the use of certain books, including novels, textbooks and reading series, in a public school curriculum. In other words, in cases like this, when teaching about religion is incorporated into a larger secular curriculum, courts have consistently found no Establishment Clause violation. *See e.g. Grove v. Mead Sch. Dist.*, 753 F.2d 1528 (9th Cir.1985) (involving a novel, *The Learning Tree*, assigned in a tenth grade English class which allegedly advanced the religion of "secular humanism" while inhibiting the plaintiffs' Christian religion); *Brown v. Woodland Jt. Unified Sch. Dist.*, 27 F.3d 1373 (9th Cir.1994) (involving the *Impressions* Reading Series which allegedly addressed religious rituals endorsing witchcraft); *Fleischfresser v. Dirs. of Sch. Dist. 200*, 15 F.3d 680 (7th Cir.1994) (involving same reading series as *Brown*). Moreover, the Supreme Court has expressly recognized that even the Bible itself may be used in public schools to teach literary and historical lessons. *Abington Sch. Dist.*, 374 U.S. at 225, 83 S.Ct. 1560.

■ Here, the State of California has determined that students should study the importance of religion in the world history and ancient civilization course to gain a better understanding of different cultures and conflicts. The SBE considered various comments and recommendations regarding the proposed textbooks, it held numerous meetings, both public and private regarding the appropriate content for the adopted textbooks and it consulted several experts in the various religions to determine whether the proposed books were accurate and neutral. After weighing all of the above, it made the decision to approve certain edits and adopt certain textbooks for use in the State's public schools. CAPEEM objects to certain aspects of the textbooks' content. However, mere disagreement with the contents of the textbooks will not establish an Establishment Clause claim. "If an Establishment Clause violation arose each time a student believed that a school practice either advanced or disapproved of a religion, school curricula would be reduced to the lowest common denominator, permitting each student to become a 'curriculum review committee' unto himself or herself." *Brown*, 27 F.3d at 1379. In this case, for the reasons set forth below, CAPEEM cannot satisfy the requisite elements of the *Lemon* test. At bottom, by this claim, CAPEEM seeks to act as a "curriculum review committee;" however, such a role, as recognized by *Brown*, is misplaced because SBE is the appropriate body to determine the contents of the textbooks.

### (1) Secular Purpose

■ The secular purpose prong of the *Lemon* test asks whether the government's actual purpose is to endorse or disapprove of religion. *Wallace v. Jaffree*, 472 U.S. 38, 56, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985). Government activity will fail the purpose prong of the test only if it is motivated *wholly* by an impermissible purpose. *Am. Family Ass'n, Inc. v. City and County of San Francisco*, 277 F.3d 1114, 1121 (9th Cir.2002) (recognizing that a reviewing court "must be reluctant to attribute unconstitutional motives to government actors in the face of a plausible secular purpose"). Here, the SBE's purpose in adopting the sixth grade history-social science textbooks is patently secular. It is fulfilling its obligation to adopt instructional materials for California students that are accurate and consistent with the State's learning objectives. Cal. Const. Art. IX, § 7.5; Cal. Educ.Code § 60200. The SBE must ensure that adopted instructional materials contain accurate and non-discriminatory portrayals of other cultures, racial diversity, religions, and the contributions of both men

and women in all types of roles. Cal. Educ.Code § 60040, 60044, 60200. Students learn about religions for the secular purpose of understanding their impact on history. (DDF ¶s 156–168.) Thus, the secular purpose of the adopted textbooks is to educate California's students about history. *Accord Grove,* 753 F.2d at 1539 (Canby, concurring) (recognizing that there was "no question that the book [there] was included within the curriculum for the entirely non-religious (i.e. secular) and commendable purpose of exposing students to different cultural attitudes and outlooks").

CAPEEM fails to offer any evidence to the contrary; indeed, it does not expressly discuss the secular purpose prong in its opposition. Thus, the court finds that defendants have demonstrated, conclusively in their favor, that the State's use of the subject textbooks has a secular purpose. The first element of the *Lemon* test is therefore satisfied.

### (2) Endorsement or Disapproval of Religion

CAPEEM alleges that the textbooks have the primary effect of advancing other religions and inhibiting the Hindu religion. (SAC ¶s 6.3–6.6, 6.9–6.10.) CAPEEM has the burden of proving that defendants violated the second prong of the *Lemon* test, which bars governmental actions that have the principal or primary effect of advancing or disapproving religion. *Vasquez v. L.A. County,* 487 F.3d 1246, 1255–56 (9th Cir.2007). A government practice has the effect of impermissibly advancing or disapproving of religion if it is "sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement and by the nonadherents as a disapproval of their individual religious doctrines." *Sch. Dist. of Grand Rapids v. Ball,* 473 U.S. 373, 390, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985). Thus, the relevant inquiry in evaluating

the second prong of the *Lemon* test is whether the government's action *actually* conveys a message of endorsement or disapproval of religion. *Lynch v. Donnelly,* 465 U.S. 668, 690, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, concurring) (emphasis added). This determination is made from the perspective of a "reasonable observer" who is informed and familiar with the history of the government's practice at issue. *Brown,* 27 F.3d at 1378–79. In evaluating Establishment Clause challenges to elementary school textbooks, the reasonable observer is an objective observer in the position of an elementary school student. *Id.* Hence, a reasonable observer in this case is the objective sixth grade student. *Id.*

In reviewing plaintiff's objections to the textbooks, the court must consider the textbooks and the curriculum as a whole to determine whether the primary effect is to endorse or inhibit religion. *Grove,* 753 F.2d at 1540 (Canby, concurring) ("Objectivity in education need not inhere in each individual item studied; if that were the requirement, precious little would be left to read."). Moreover, the court does not consider the various expert opinions offered by both parties on this issue. The United States Supreme Court generally has not relied on expert testimony to determine whether a school practice reasonably appears to endorse or inhibit religion. *See e.g. Zobrest v. Catalina Foothills Sch. Dist.,* 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993). "Instead of engaging in a 'battle of the experts' in deciding Establishment Clause cases, courts rely upon assumptions about a 'hypothetical observer' (in this case a hypothetical child) to determine whether a government action conveys an endorsement [or inhibition] of religion." *Brown,* 27 F.3d at 1382 (internal citations omitted). Thus, in *Brown* the court recognized that

testimony of expert witnesses does not raise a genuine issue of fact for trial where it is "of little use in determining whether a practice is unconstitutional." *Id.* Accordingly, this court has not relied on the various experts' opinions offered on this issue by the parties.

To prevail on this element of the *Lemon* test, CAPEEM must show that an objective sixth grade student would find that the primary effect of the textbooks is to convey a message that the government endorses Abrahamic religions or disapproves of Hinduism. While the parties heavily dispute whether the adopted textbooks neutrally and accurately depict these religions, that dispute does not preclude entry of summary judgment in favor of defendants. Even considering the evidence in the light most favorable to plaintiff (i.e., accepting plaintiff's position that the texts, in part, inaccurately and negatively depict Hinduism while simultaneously providing a more favorable depiction of Abrahamic religions),[23] the court cannot find that the textbooks, when viewed as a whole and as part of the overall curriculum, convey a message of government endorsement or disapproval of a particular religion.

Significantly, the challenged passages of the textbooks are only a small portion of otherwise clearly nonreligious texts—the books at issue are *history-social sciences* textbooks—which are part of a clearly, nonreligious history-social sciences program. In that respect, this case is closely analogous to *Brown* wherein the Ninth Circuit recognized that when a challenged textbook is only a small part of an otherwise clearly nonreligious program, it is "unlikely that [an] objective observer would perceive the inclusion of the [objected-to] selections . . . as an endorsement or

disapproval of religion." 27 F.3d at 1381 ("The fact that the Challenged Selections constitute only a minute part of the *Impressions* curriculum further ensures that an objective observer in the position of an elementary school student would not view them as religious rituals endorsing witchcraft.")

The Ninth Circuit's decision in *Grove* is in accord, and *Grove* is also factually analogous to this case. In *Grove*, the plaintiffs alleged that the book entitled *The Learning Tree*, which was part of the defendant school's sophomore curriculum, advanced the religion of secular humanism in violation of the Establishment Clause. The court rejected the claim. Observing that the Supreme Court has stated clearly that literary and historic study of the Bible is not prohibited religious activity, the court concluded the reading of the book was not a ritual but a study of the "expectations and orientations of Black Americans." 753 F.2d at 1534. The court considered the book "in the context of the whole curriculum" and concluded that it was one book "included in a group of religiously neutral books in a review of English literature, as a comment on an American subculture." *Id.*

Plaintiff's reliance, to the contrary, on *Vaughn* and *Herdahl* is uncompelling. These cases involved the teaching of *religious education classes*, in *Herdahl*, more specifically, the Bible, by private religious educators brought in to the public schools by the school districts; the classes were taught during normal school hours and on school grounds; students could "opt out" of the religious education classes and perform other course work during this class time. *Vaughn*, 313 F.Supp. at 433–34; *Herdahl*, 933 F.Supp. at 593–98. As stat-

---

**23.** *See Grove*, 753 F.2d at 1539 (Canby, concurring) (assuming arguendo that the *Learning Tree* embodied anti-Christian elements and finding that summary judgment was properly granted in the defendant school district's favor).

ed succinctly by the *Herdahl* court, such overtly, religious classes are not presented "objectively as part of a secular program of education" and thus, clearly violate the Establishment Clause. *Herdahl,* 933 F.Supp. at 595 (noting that the testimony of the Bible teachers themselves, the lessons plans, exams and Bible class materials all confirmed that the Bible classes offered at the schools advance religion in general and specifically, fundamentalist Christianity).

The same cannot be said of defendants' use of the subject history-social sciences textbooks in this case. Here, the study of religion, including Hinduism, is done in the context of the sixth grade world history and ancient civilizations course. (DUF ¶ 2.) More specifically, the study of religion is done within the larger context of human history. (DDF ¶s 156–168.) Students study the world history and geography of ancient civilizations, including the early societies of the near East and Africa, the ancient Hebrew civilization, Greece, Rome and the classical civilizations of India and China. (DDF ¶ 161.) Students receive an overview of these societies, including the geography of the region; trade; art; social, economic and political structures; and the everyday lives of the people. (DDF ¶ 162.) In this context, students study about the religions and religious texts of the different ancient civilizations. (DDF ¶s 163–168.) It is within this overall curriculum that plaintiff's specific objections to the texts must be evaluated.

And, within this context, the court cannot find that a reasonable sixth grade student using the in question texts would believe the primary effect of the books is to convey a message that the State approves of a particular religion or specifically disapproves of Hinduism. A few examples ably illustrate this point. For instance, CAPEEM objects to the OUP's portrayal of Hindu women (PDF ¶ 243),

but the specific section it complains of is a direct quote from a Hindu text, the Code of Manu (*Id.*). The OUP textbook goes on to sensitize the quote by explaining that women were more independent than what the Code says, stating: "The code claims that 'On account of offspring, a wife is the bearer of many blessing, worthy of honor, and the light within a home; indeed in a home no distinction at all exits between a wife and Sri, the Goddess of Fortune." (Adams Supp. Decl, Ex. A at 141.) Thus, when read in context, it is clear that the textbook actually softens the portrayal of women's role from that found in the ancient Hindu texts. CAPEEM's objections to the caste system are equally unavailing when read in context. For example, plaintiff objects that the textbook by McGraw Hill "passes a judgment that the caste system was wrong as it was a system created by Aryans for light-skinned people to oppress dark-skinned people." (PDF ¶ 217.) To the contrary, the subject textbook actually provides that no one is sure why the caste system was created, and it gives multiple possible reasons, including: "[I]deas about skin color were probably part of it. The Aryans were a light-skinned people. They thought they were better than the dark-skinned people they encountered in India. This idea was wrong but the Aryans believed it." (Balasubramani Decl., filed Jan. 13, 2009 [Docket # 172], Ex. 87–1.) Moreover, the textbooks refer to the "Aryans" developing the caste system, not Hindus.

The State has an obligation to teach history, including its "warts and bumps," as described by defendants. (Defs.' Reply at 15:19.) Conveying accurate but what may well be perceived as negative aspects of Hinduism does not mean that the primary effect of the textbooks is to inhibit religion. *See Grove,* 753 F.2d at 1540–41 (Canby, concurring) (noting that "Chris-

tianity's negative portrayal in curriculum reading material does not support a finding of government disapproval of Christianity"). CAPEEM argues here that the portrayals of Hinduism in a variety of respects should be more positive because CAPEEM perceives the current depictions as hostile to Hinduism. (Pl.'s Opp'n to MSJ at 26–30.) However, courts have held that even government action that has the effect of perceived hostility toward a religious group does not violate the Establishment Clause so long as the hostility is not the action's *primary* effect. *Brown*, 27 F.3d at 1378–79. CAPEEM has failed to show that the State's refusal to accept the HEF/VF edits resulted in the adoption of textbooks that an objective sixth grade student would find convey a message of government disapproval of Hinduism.

◼ CAPEEM's comparison of edits that were accepted or rejected between different religious groups, allegedly demonstrating the more favorable treatment of other Abrahamic religions, is equally unavailing. The appropriateness of the recommended edits for each religion must be determined on a religion-by-religion basis as each has its own tenets. Furthermore, courts have repeatedly recognized that "[t]otal separation of church and state is simply impossible." *Grove*, 753 F.2d at 1539 (Canby, concurring) (citing *Lynch*, 104 S.Ct. at 1362, 104 S.Ct. 1355). The First Amendment is not violated merely because particular governmental activity happens to "coincide or harmonize with the tenets of some or all religions." *Id.* (internal quotations and citations omitted). Finally, the Supreme Court has warned that courts should not be in the position of analyzing the minutia of textbook edits and curriculum decisions. As set forth above, in *Abington Sch. Dist.*, the Court specifically recognized that teaching many social sciences requires mentioning religions, but ultimately decisions about how religion is taught:

> are matters which the courts ought to entrust very largely to the experienced officials who superintend our Nation's public schools. They are experts in such matters, and [the courts] are not.

374 U.S. at 300, 83 S.Ct. 1560 (Brennan, J., concurring). Indeed, plaintiff fails to cite even one analogous case wherein a court struck down a school's use of a particular book on Establishment Clause grounds. And, controlling case law from this circuit plainly supports defendants' position that their adoption of the subject textbooks did not violate the Establishment Clause. For the reasons set forth above, *Brown* and *Grove* are factually analogous cases which largely control the resolution of this issue.

In sum, CAPEEM's isolated passages taken out of context do not support its Establishment Clause claim. When the textbooks are read as a whole, and as part of the larger curriculum, it is clear that the primary effect of the textbooks is to educate students about ancient history, and not to serve as a religious primer. *See Grove*, 753 F.2d at 1540. The textbooks are history books.[24] An objective sixth grade student would find that the primary effect of the textbooks is education about world history, rather than promoting or inhibiting religions. Because CAPEEM

---

24. Indeed, in analyzing the same essential challenges to the textbooks under state law, a state superior court determined that the subject books are neutral and non-discriminatory. "The various texts appear to the Court on their face to be dispassionate and neutral with respect to religion, objectively describing the features of the Hindu religion and others without overtly or covertly 'taking sides' with one another. Moreover, the Court finds nothing in the way of derogatory language or examples from sacred texts or other religious literature that could be classified as derogatory, accusatory or that would instill prejudice against the Hindu religion or its faithful. (Defs.' RJN, Ex. A at A0010.)

cannot meet its burden of proving otherwise, its challenge to the textbooks' contents fails the second prong of the *Lemon* test.

### (3) Excessive Entanglement with Religion

■ The third prong of the *Lemon* test prohibits excessive entanglement with religion. The Ninth Circuit recognized in *Brown* that the mere adoption and use of curriculum materials is insufficient to constitute excessive entanglement. 27 F.3d at 1383–84. Here, other than objecting to defendants' adoption of the subject textbooks, plaintiff points to no other conduct by defendants which could support a finding of an excessive entanglement with religion. Again, for the reasons set forth above, the subject textbooks are history books which contain some discussion of religion. Plaintiff has not demonstrated how that limited discussion endorses or inhibits any particular religion or creates an excessive entanglement with religion.

In its only argument opposing defendants' motion on this issue, plaintiff cites out-of-circuit authority holding that unlawful entanglement can be shown where the government is placed in a position of choosing among "competing religious views." *EEOC v. Catholic Univ. of Am.*, 317 U.S.App.D.C. 343, 83 F.3d 455 (D.C.Cir.1996); *Rweyemamu v. Cote*, 520 F.3d 198, 208 (2nd Cir.2008). Plaintiff contends it has proffered evidence of defendants' decisions choosing among competing religious beliefs. For example, plaintiff contends that during the textbook adoption process, defendants adjudicated between competing visions of the significance of the crucifixion of Jesus. (PDF ¶ 88.) Even if these cases were binding on this court, they would not support a finding of excessive entanglement in this case.

These decisions do not address a State's adoption of secular curriculum materials and as such, are inapposite. *Catholic Univ. of Am.*, 317 U.S.App. D.C. at 353, 83 F.3d 455 (dismissing a Catholic nun's Title VII sex discrimination suit against the University because the controversy over the nun's qualifications for tenure placed the court in the impermissible position of having to evaluate competing opinions on religious subjects, which the Establishment Clause does not permit); *accord Rweyemamu*, 520 F.3d at 208 (dismissing African American Catholic priest's Title VII race discrimination suit against Bishop and Diocese wherein he alleged that the Roman Catholic Diocese misapplied canon law in denying him a promotion to parish administrator). These cases involve the so-called "ministerial exception" under which courts have declined to interfere with ecclesiastical hierarchies, church administration, and appointment of clergy, recognizing that to take sides in a religious dispute would lead an Article III court into excessive entanglement in violation of the Establishment Clause. Clearly, the "ministerial exception" has no applicability to this case.

To the contrary, the Ninth Circuit held in *Brown*, a case challenging a school district's use of a particular reading series allegedly endorsing religious rituals of witchcraft, that the mere adoption and use of curriculum materials does not establish excessive entanglement for purposes of the *Lemon* test. 27 F.3d at 1383 (recognizing that the School District's use of the reading series was "not an intentional effort to aid overtly religious exercises and issues"). The same is true here. Plaintiff has failed to establish that defendants' use of the subject textbooks foster an excessive entanglement with religion, and thus, summary judgment is properly entered in defendants' favor. Plaintiff cannot show that any of the three prongs of the *Lemon* test has been breached in this case.

The court therefore GRANTS defendants' motion as to plaintiff's Establishment Clause claim based on defendants' adoption and use of the subject sixth-grade history-social sciences textbooks.

#### d. Free Speech and Association Clause Claim

 Defendants move for summary judgment as to plaintiff's third claim for relief for violation of the First Amendment's Free Speech and Association Clauses on the ground plaintiff cannot establish a violation of their members' free speech or association rights because CAPEEM has no right to dictate the content of the government's speech in this case, and defendants can impose reasonable time, place and manner restrictions on plaintiff's members' speech conducted in limited public fora. (Defs.' Mem. of P. & A. in Supp. of MSJ, filed Dec. 30, 2008 [Docket # 157], at 32–35.) Defendants' arguments misconstrue the nature of this claim. As alleged in the second amended complaint, CAPEEM contends defendants improperly penalized CAPEEM members (and others who supported the HEF/VF edits) for their supposed affiliation with third party "Hindutva" groups. Plaintiff asserts that in rejecting the HEF/VF edits solely because defendants believed CAPEEM members and other Hindu groups were affiliated with certain third-party "Hindu nationalists" groups, defendants chilled the First Amendment free speech and association rights of CAPEEM's members. (SAC ¶s 7.1–7.9.)

This is plaintiff's theory as alleged in its complaint. Now, at summary judgment, plaintiff must proffer evidence in support of that theory. In attempting to establish the existence of a factual dispute, the opposing party may not simply rely upon its pleading, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, to support its contention that a factual dispute exists. Fed.R.Civ.P. 56(e). Plaintiff has not done so here. In its opposition, plaintiff cites only the deposition testimony of CAPEEM member Karthik Venkataramani in support of this claim. (Pls.' Opp'n to Defs.' MSJ at 33–34.) Mr. Venkataramani testified that his wife was concerned over him being demonized for his participation in the textbook adoption process, and she wondered whether his participation in the process would inhibit other civil rights activities he might choose to engage in the future. (PDF ¶ 169.)

Said testimony is insufficient to raise a triable issue of fact as to whether defendants' conduct chilled CAPEEM's members free speech and association rights. First, the testimony is inadmissible hearsay and not properly considered by the court in the first instance. Fed.R.Evid. 801. Even were the court to consider the evidence, the testimony does not establish that Mr. Venkataramani was "demonized" due to any affiliation with Hindutva or Hindu nationalist groups, nor does it establish that due to defendants' conduct, allegedly affiliating him with such groups, Mr. Venkataramani refrained from engaging in certain speech or association. This testimony is simply irrelevant to this claim.

Because plaintiff offers no evidence whatsoever in support of its mere allegations that its members' free speech and association rights were chilled as a result of defendants' alleged actions affiliating CAPEEM's members with Hindu extremist groups, the court must grant judgment in defendants' favor on this claim. While defendants did not move for summary judgment on this precise ground, they did move for judgment in their favor on this claim. As the moving party, who does not bear the burden of proof at trial on this claim, defendants needed to show only "that there is an absence of evidence to

support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. 2548. In their reply, defendants point out, correctly, that plaintiff's opposition relies on "mere allegations and denials" which are insufficient to meet its burden on summary judgment. *Id.*; (Defs' Reply at 18.) Without admissible evidence to support its claim, plaintiff cannot withstand summary judgment.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for partial summary judgment as to its equal protection claim asserted on the basis of the alleged unlawful indoctrination of students into the Christian and Jewish religions is DENIED; plaintiff lacks standing to raise such a claim which is not germane to its organizational purpose. Defendants' motion for summary judgment, or alternatively, partial summary judgment is GRANTED in part and DENIED in part. Judgment is entered in defendants' favor as to plaintiff's Establishment and Free Speech and Association Clause claims. Defendants' motion is DENIED with respect to plaintiff's equal protection claim to the extent it alleges violations of law based on conduct occurring during the textbook adoption process; defendants' motion as to plaintiff's equal protection claim is GRANTED, however, to the extent this claim is based on the subject textbooks' content; such a claim is not cognizable under the Equal Protection Clause.

IT IS SO ORDERED.